EAST ST. LOUIS CONNECTING RY. CO. et al. v. JARVIS.

(Circuit Court of Appeals, Seventh Circuit. March 28, 1899.)

No. 377.

1. RAILROAD LEASES—LIABILITY FOR RENT.

A lease to a railroad corporation provided for a fixed annual rental, and a sum equal to a certain per cent. of the annual gross earnings of the corporation, if they exceeded a specified sum. The W. Co. was substantially the owner of all the stock of the lessee corporation. In an action by the lessor for the rent, the bill of complaint alleged that the W. Co., by reason of its ownership of the stock of the lessee, received all the gross earnings of the latter company, of which it kept an account, and that it falsified the account. *Held*, assuming the allegations as true, that the W. Co. is not

liable for the rent, the lessor having no legal or equitable interest in the gross earnings themselves.

**2. RAILROADS—COMPETING AND PARALLEL LINES.**

Two belt lines of railway were both intended principally to connect the termini of railroads at East St. Louis with the river transfers to St. Louis, but they were not geographically parallel, and each one did not touch all the places touched by the other. The one road crossed all the lines of railway crossed by the other. They were not competing in respect to certain local industries, because both did not have access to them, but they did compete in the principal business. The two lines cut rates against each other, and finally, to avoid loss, were put under the same management. *Held* parallel and competing lines, within Const. Ill. art. 11, § 11, forbidding their consolidation.

**3. SAME—TEN-YEAR LEASE—CONSOLIDATION.**

A lease of a parallel and competing railroad for 10 years is a "consolidation," within Const. Ill. art. 11, § 11, so as to be forbidden.

**4. SAME—VOID LEASES—ACTIONS.**

A lease of a competing and parallel railroad, where prohibited by the constitution, is void ab initio, so that no action can be maintained on a covenant therein, notwithstanding the lessee has had the benefit of the lease, since a void contract cannot be ratified.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

The facts of this case are voluminous, and somewhat involved, but, for an understanding of the grounds upon which the opinion proceeds, may be summarized as follows:

The East St. Louis Connecting Railway was organized under the general railroad law of Illinois, in the year 1877, to construct a railroad from Venice, in Madison county, to the track of the Illinois & St. Louis Railroad & Coal Company, in St. Clair county, a distance of about four miles, with power to connect its track with intersecting railroads, with adjacent industries, and with river transfer tracks and landings. Its railway, as it was constructed on July 1, 1885, the date of the leases hereinafter mentioned, did not reach either of the termini named in its charter. It was a north and south line, constructed on Front street, in East St. Louis, from the head of the island to the north side of Cahokia creek, connecting the Wiggins Ferry Transfer with the several lines of railroad terminating on the river front of the city of East St. Louis. It did not reach Venice on the north, and it had no connection at the sorth with the railway of the Illinois & St. Louis Railroad & Coal Company, or its river transfer to St. Louis from the dyke south of Cahokia creek. Soon after the date of the leases this southerly connection was completed, and about 1890 the road was extended north to Venice. In the year 1880 the Venice & Carondelet Railroad Company was organized, under the laws of the state of Illinois, to construct a railroad from Venice to the village of East Carondelet, in St. Clair county, and to connect with all railroad lines which terminate at or pass through the city of East St. Louis, and to connect with the bridge of the St. Louis Bridge Company across the Mississippi river, with power to extend its railway to the relay station in East St. Louis. Its railway was constructed on a circuitous route from Venice, on the north, around the northern, eastern, and southern boundaries of East St. Louis, to a junction on the south with the track of the Illinois & St. Louis Railroad & Coal Company, but it did not at that time have any independent connection with the river or river transfers; connecting, however, with the Madison Ferry on the north by means of the Chicago & Alton Railway, and at the south with the ferry at the dyke by means of the railway tracks of the Illinois & St. Louis Railroad & Coal Company.

The situation, then, was this: Prior to the leases the Venice & Carondelet Railway intercepted all railways leading to the river, and was able to transfer traffic from such railways over its tracks to the tracks of the Illinois & St. Louis Railroad & Coal Company, and to its ferry over the Mississippi river

at the south. The East St. Louis Connecting Railway intercepted the lines of railway north of Cahokia creek, and was able to transfer the traffic upon such railways from their termini to the Wiggins Ferry Company, and so effect the transfer to the city of St. Louis. The completion of the southern extension of the St. Louis Connecting Railway to the tracks south of Cahokia creek allowed the transfer of cars across the Mississippi river by means of the ferry of the Illinois & St. Louis Railroad & Coal Company, which was at the dyke. The track of the Venice & Carondelet Railway, in connection with the track of the Illinois & St. Louis Railroad & Coal Company from the junction of the two roads to the river, made a belt around East St. Louis from Venice on the north to the dyke on the south, and this belt crossed and connected with every railroad terminating at East St. Louis, with transfer from the dyke to the city of St. Louis by means of the ferry of the Illinois & St. Louis Railroad & Coal Company. The extension of the East St. Louis Connecting Railway north to Venice, taken in connection with its southerly extension, and with the Venice & Carondelet Railway, made a completed girdle around the city of East St. Louis. The Venice & Carondelet Railway was, in fact, constructed by the Illinois & St. Louis Railroad & Coal Company and in its interest, and was leased to the latter company, which held and operated it.

On July 1, 1885, the Illinois & St. Louis Railroad & Coal Company leased to the East St. Louis Connecting Railway Company for a term of 10 years the Venice & Carondelet Railway, its spur tracks, and the telegraph lines from Venice to the dyke, with the offices, fixtures, and terminal tracks at the dyke to the river incline, and the joint user of the tracks of the Illinois & St. Louis Railroad between its junction with the Venice & Carondelet Railway and the terminal tracks at the dyke. There were also leased three locomotives, and the right to use the lessor's roundhouse at the dyke. The lease provided for rental as follows: "Sixth. The said party of the second part agrees and covenants to pay to the said party of the first part, as consideration for the leasing of all the railroad property, above mentioned, the sum of eight thousand dollars per annum, payable in monthly installments of six hundred and sixty-six $66/100$ dollars at the end of each and every month, at the office of said party of the first part at St. Louis, Missouri. And the said party of the second part shall not be compelled to pay more than said eight thousand dollars per annum for the first three years of the continuance of this lease, but after that time, should the gross earnings of the East St. Louis Connecting Railway Company, from all its business, including the earnings of all lines and privileges hereby leased (but not including the revenue derived by said party of the second part from the river-transfer business this day leased by the party of the first part to the party of the second part), exceed the sum of one hundred and sixty thousand dollars for any one year, then the said party of the second part covenants and agrees to pay to the said party of the first part for such year, in addition to said eight thousand dollars, a sum equal to seven per cent. of such gross earnings, less the sum of eight thousand dollars; and, when the gross earnings of said party of the second part shall exceed the sum of one hundred and seventy thousand dollars for any one year, then the said party of the second part covenants and agrees that it will pay for such year, in addition to said rental of eight thousand dollars per annum, a further sum equal to eight per cent. of its gross revenue from such sources, less the sum of eight thousand dollars: and, when the gross revenue of said party of the second part shall exceed the sum of one hundred and eighty thousand dollars for any one year, then the said party of the second part covenants to pay to the said party of the first part for such year, in addition to said rental of eight thousand dollars per annum, a sum equal to nine per cent. of its gross revenue, less the sum of eight thousand dollars. And at the end of the fourth year from the date of these presents, and at the termination of each and every year thereafter, an account shall be rendered by said party of the second part to said party of the first part of its gross earnings for said year, and the additional rental hereby provided, if any, over and above the sum of eight thousand dollars, shall be ascertained, and paid at the end of each year." The lessee, in addition, covenanted to pay all taxes and assessments against the leased property, and an "equitable proportion" of the taxes upon so much of the main line of the lessor's railroad as was made subject to joint use, and to

92 F.—47

carry out and perform the agreement made by the lessor with seven railroad companies named, whose lines terminate at the city of East St. Louis, which contracts are not in the record. The lease contained the further clause: "Fifteenth. It is further stipulated and agreed that the party of the first part, its successors or assigns, will, at no time within the term of this agreement, engage in the business of switching cars from any connecting railway for any purpose whatever, nor shall it permit any one operating their road to engage in such switching for any purpose during the term of this agreement. Any breach of this stipulation to operate as a forfeiture of this lease and agreement, if so determined by the party of the second part."

On the same day the parties executed a second lease, by which the lessor leased to the East St. Louis Connecting Railway Company for a period of 10 years all of its incline, cradle, and equipments used by it in its business in transferring cars across the Mississippi river at St. Louis, with the right to use and operate the same upon the lessor's land, together with certain wharves and wharfage rights in the city of St. Louis, and also a tugboat with two barges, at a rental of $10,000 per annum and the payment of all taxes. This lease contained the following clause: "(6) And the said party of the first part covenants and agrees with the said party of the second part that for the period of ten years from and after the 1st day of July, 1885, it will not engage in or carry on the business of transferring railroad cars in boats or barges across the Mississippi river to or from any point at St. Louis, Missouri. Any breach of this covenant to work a forfeiture of this lease and contract at the option of the party of the second part." The lease also provided that, upon the termination of the lease upon the happening of any of the events stated therein, the lessee should have the option to terminate the first lease hereinbefore recited. Under these leases the East St. Louis Connecting Railway Company went into possession, and, as is claimed, the leased property and the property of the East St. Louis Connecting Railway Company were, in fact, managed and operated by the Wiggins Ferry Company, which latter company owned substantially all the stock of the former, and kept all accounts connected with the management of the general business. On September 1, 1890, the East St. Louis Connecting Railway Company sublet the Venice & Carondelet Railway to the Electric City & Illinois Railway Company for the remaining term of the original lease and a rental of $9,600 a year, the sublessee assuming all the obligations imposed in the original contract. On April 24, 1894, the East St. Louis Connecting Railway Company gave notice that it would abandon all the property described in the leases, and that such property would be returned to the lessor on the 30th day of that month. But it is claimed that such surrender was not fully carried out, and that a large portion of the leased premises remained in the possession of the lessee until July 1, 1895. On the 30th of April the East St. Louis Connecting Railway Company formally repudiated the leases, notified its sublessee thereof, and to attorn to the complainants, and received no more rent therefor. It is claimed that the sublessee attorned to the lessor, and paid the $9,600 per annum until July 1, 1895, and that the lessor accepted such rental.

On May 21, 1889, the Illinois & St. Louis Railroad & Coal Company, the Venice & Carondelet Railway Company, and three other railroad companies were consolidated, under the title of the Louisville, Evansville & St. Louis Consolidated Railroad Company. On January 23, 1894, in a certain suit in the circuit court of the United States for the Southern district of Illinois, James H. Wilson and E. O. Hopkins were appointed receivers of the Louisville, Evansville & St. Louis Consolidated Railroad Company, with the usual powers of receivers in like cases; and on the 17th day of March, 1894, these receivers filed the present bill of complaint against the East St. Louis Connecting Railway Company and the Wiggins Ferry Company, setting out the two leases which have been stated, and the succession of the company of which they were receivers to the lawful ownership of the property described in the leases, and that they were entitled to receive the issues, rent, profits, and benefits of said contract of lease. They aver that the Wiggins Ferry Company had some interest in the East St. Louis Connecting Railway Company by virtue of which it controlled and operated the latter, and had an interest in it, and was bound by the terms of the leases; and they averred that the two companies named

as defendants, the appellants here, intending to defraud the Louisville, Evansville & St. Louis Consolidated Railroad Company and its receivers, particularly in the matter of percentages due upon the gross earnings, had, by a false and fraudulent system of bookkeeping, so manipulated the earnings arising from the operation of the leased premises and property as to make it appear that the actual earnings were less than $160,000 per annum, and thereby fraudulently withheld from the Consolidated Railroad Company and its receivers an amount exceeding in the aggregate the sum of $50,000; that the Wiggins Ferry Company caused its agents to fraudulently suppress and reduce the earnings of through traffic, and thereby fraudulently deprived the Consolidated Railroad Company and its receivers of large revenues, and that the accounts that it kept were false and fraudulent, and that each company defendant has refused to make a true account and statement of the earnings. The bill prayed that an account might be taken of the transactions of the defendants in respect to the gross earnings and the rents due by reason thereof; that the same be fully adjusted, and the respective rights of the parties be ascertained; and that the defendants be decreed to pay the complainants what should appear to be due. The defendants in April, 1894, separately demurred to the bill. These demurrers were overruled, and on the 30th of June, 1894, the defendants filed their separate answers, which, denying the general equity of the bill, averred that the Wiggins Ferry Company was in no manner bound by the terms of the leases, and setting up other defenses, not necessary here to be detailed. The East St. Louis Connecting Railway Company upon the same day filed its plea to the bill of complaint, which is to the effect that the Venice & Carondelet Railway and the East St. Louis Connecting Railway were parallel and competing lines, and that, under the constitution of the state of Illinois, the leases were unlawful and void. A replication was filed to this plea, testimony was taken thereon, and on the 25th day of January, 1896, the court found the bill to be true, the answers and the plea to be untrue, and entered an interlocutory decree, referring it to a master to take account of the money that had accrued from the joint operation of the railroad of the defendant the East St. Louis Connecting Railway Company and the defendant the Wiggins Ferry Company, and the leased property and premises described in the contracts of lease arising therefrom on the 1st day of July, 1838, to the expiration of the lease, July 1, 1895, and which had accrued or might have accrued thereunder if the covenants of the lease had been faithfully performed, and requiring that the defendants be compelled to produce before the master all books, papers, and writings in their custody or under their control relating to the matters at issue. On August 5, 1896, the master filed his report, finding that there was due to the complainant receivers the sum of $93,725.11, which report was duly excepted to. The exceptions were overruled. This amount is made up as follows:

| | |
|---|---:|
| For rent due | $52,321 95 |
| For taxes and penalties | 12,630 16 |
| For engines | 2,000 00 |
| For tracks, inclines, cradles, etc | 15,000 00 |
| For damage transfer property | 11,800 00 |
| | $93,752 11 |

It is understood that the rental of $8,000 per annum was paid to the lessor until April 30, 1894, and thereafter, until the expiration of the term of the lease, July 1, 1895, it received from the sublessee the sum of $9,600 per annum. On the 26th of September, 1896, George T. Jarvis, who had been appointed receiver in the place of Wilson and Hopkins, was substituted as complainant, and a final decree passed that he, as complainant, recover from the East St. Louis Connecting Railway Company and the Wiggins Ferry Company the sum of $93,752.11, with interest from the date of the decree; to review which decree this appeal is brought.

Charles W. Thomas, for appellants.

Bluford Wilson and W. L. Taylor, for appellee.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Upon this record three questions are presented for consideration: First, is the Wiggins Ferry Company shown to be liable for the rental reserved by the lease? second, are the Venice & Carondelet and the East St. Louis Connecting Railways parallel or competing lines of railway? and, third, do the leases amount to a "consolidation," within the meaning of the constitution of the state of Illinois prohibiting the consolidation of the stock, franchises, or property of parallel or competing lines of railway? These questions will be considered in their order.

1. The bill is brought to recover rental claimed to be due upon the lease. The sole averment connecting the Wiggins Ferry Company with the transaction is that it "has some interest in the East St. Louis Connecting Railway Company, by virtue of which it controls and 'operates the said connecting company, and has an interest in, and is bound by the terms of, the leases above set out, but the precise nature of the relation existing between the said defendant companies is now unknown to these complainants, and in making up the reports of gross earnings required by the lease caused its agents and bookkeepers to fraudulently suppress and reduce the earnings of through traffic passing over the leased premises and the other lines operated by the Wiggins Ferry Company"; by reason whereof "only one-half of the proper earnings from such through traffic appeared in the account from which the annual statement was rendered to the said Louisville, Evansville & St. Louis Consolidated Railroad Company as a basis for fixing the annual rent to become due and payable under the terms of the said contract of lease, * * * and by means whereof it was deprived of large revenues, amounting in the aggregate, for the years mentioned, to about the sum of $50,000, which these complainants are entitled to have and receive from the said defendant companies or either of them." It is to be observed that this is a suit founded purely upon the lease and to recover the rental thereby reserved. The only ground upon which the equity jurisdiction can be invoked or sustained is to enforce the accounting which the lease required to be kept of the gross earnings of the lines specified in the lease. The lessor company, however, had no equitable lien upon, or any right to, those gross earnings, or any part of them. The account of them which was to be kept had no function except as a measure of the quantum of rental to be paid under the lease. The language of the contract is explicit, and leaves no room for contention in this respect. The lessee is to pay as rental the sum of $8,000 per annum in equal monthly installments at the end of each and every month. This amount of rental was absolute for the first three years of the lease, but thereafter, should the gross earnings of the East St. Louis Connecting Railway Company from all its business, including the earnings of all lines, exceed the sum of $160,000 for any one year, then the lessee covenanted and agreed to pay as rental a sum equal to 7 per cent. of such gross earnings; 8 per cent. if the gross earnings should exceed $170,000 for any one year, and 9 per cent. if it

exceeded $180,000 in any one year. So that the lessor company had no interest in the gross earnings of the leased road, or any right to their appropriation to any particular purpose. They were the absolute property of the lessee, and which, so far as concerned the lessor, it could dispose of as it saw fit. The lessor company was indeed entitled to know their amount, because the contract of lease required the lessee to furnish a statement of the gross earnings, and this because, and only because, the lessee agreed to pay as rental a sum equal to a certain percentage of the gross earnings. The amount of gross earnings was a mere standard by which to measure the rental which the lessee agreed to pay. The gross earnings were not pledged for the payment of the rental, nor was any right to them, or any part of them, conferred upon the lessor company. The Wiggins Ferry Company, it appears, was substantially the owner of all the stock of the East St. Louis Connecting Railway Company, but that fact does not render the former company liable for the rental. There was neither privity of contract nor privity of estate charged or shown between the lessor company and the Wiggins Ferry Company. The extent of its offending, and the ground upon which liability for this rental is imputed, is this: That by reason of its ownership of the stock of the East St. Louis Connecting Railway Company it received all the gross earnings of the latter company, of which it kept an account, and that it falsified that account with respect to the through traffic, so as to show that the lessor company should receive a less sum as rental than that to which it was entitled. We fail, however, to understand upon what principle these acts of the Wiggins Ferry Company, assuming them to be broadly fraudulent as charged, could render it liable for the rental. If the lessor company had an equitable interest in the gross earnings, and they had been converted by the Wiggins Ferry Company, or had been diverted from the purpose to which they should be applied, there would be possible ground for the contention; but as the lessor company had no interest, legal or equitable, in these gross earnings, and must rely upon the covenants of the lease for the recovery of the rental reserved, it is not perceived that the Wiggins Ferry Company has rendered itself liable upon those covenants entered into by another party, and by which it is not bound, merely because it rendered, or caused to be rendered, to the lessor an untrue statement of the gross earnings, and falsified the standard by which the quantum of rental was to be measured. The decree adjudging the Wiggins Ferry Company liable for the rentals was therefore erroneous.

2. The constitution of the state of Illinois (article 11, § 11) provides: "No railroad corporation shall consolidate its stock, property or franchise with any other railroad corporation owning a parallel or competing line." Were these two railways "parallel or competing lines," within the meaning of this provision? They were both designed as belt lines of railway, intended principally to connect the termini of the many railroads terminating at East St. Louis with the river transfers to the city of St. Louis. There was the Madison Ferry Transfer at the north and at or near Venice, the ferry of the Wiggins Ferry Company between Venice and Cahokia creek, and that of the

Illinois & St. Louis Railroad & Coal Company south of Cahokia creek and at the dyke. The one line was constructed on Front street, in the city of East St. Louis, near the water's edge; the other by a circuitous route to the tracks of the Illinois & St. Louis Railroad & Coal Company, and connected by means of the tracks of the latter company with the ferry transfer at the dyke, and by another line of railway with the Madison Ferry at the north. The two belt lines crossed and tapped all of the various railways north of Cahokia creek, terminating at East St. Louis. The charter of each company made the northerly terminus of the road at Venice, and authorized connection at the south with the road of the Illinois & St. Louis Railroad & Coal Company. We cannot doubt that these lines are "parallel lines," within the meaning and intent of the constitutional provision. The term "parallel" is not employed in the constitution in its merely geographical sense. It does not mean two lines of railway that are equidistant from each other. That would be a narrow construction of the constitutional provision, which would defeat its purpose. It means lines of railway having the same general direction, and therefore likely to come in competition with each other. We also think it clear, upon the evidence and from the charters of the companies, that they were, and were designed to be, competing lines of railway. The Venice & Carondelet Railway crossed all the lines of railway which were crossed by the railway of the East St. Louis Connecting Railway Company. The one company connected with the Madison Ferry Transfer on the north, and with the ferry transfer of the Illinois & St. Louis Railroad & Coal Company on the south. The other company connected with the Wiggins Ferry Company, which latter company owned practically all of its stock. Necessarily they would compete with each other with respect to the transfer to the ferry companies of cars coming to East St. Louis over the lines of any railway which they both crossed. It is true that, with respect to certain local industries, they were not competing, because both had not access to them; but the principal business designed was the transfer of through traffic to the city of St. Louis, and the one company, in connection with the ferry companies with which it connected, was the competitor of the other. We think this plain upon its face, and that no elaboration could strengthen the statement. The evidence of the case also clearly demonstrates the fact. It appears that in the year 1884 these two companies were cutting rates, buying business, and losing money, and upon the advice of a mutual friend, not then connected with either company or with either of the ferry companies, the two companies concluded to put the two properties under the same management, and as a result the leases in question were made. The effect of this transaction was to place these two belt lines under one control, giving connection with all the roads entering East St. Louis and with all the car ferries crossing the river to St. Louis. This, of course, avoided competition and enabled the management to establish rates and avoid the danger of cutting rates. The practical effect was to create a monopoly, stifling competition, and that this was designed is manifest from the terms of the lease. To accomplish it, required not only the

lease of the Venice & Carondelet Railway, which was built in the interest of and leased to the Illinois & St. Louis Railroad & Coal Company, but also a lease of the ferry transfer of the latter company. This placed both the belt railways and the ferry transfers under one control. In the lease of the Venice & Carondelet Railway the lessor agreed that during the term of the lease it would not engage in the business of switching cars from any connecting railway for any purpose whatever, nor permit any one operating its road so to do, and in the lease of the ferry the lessor agreed that during the term of the lease it would not engage in or carry on the business of transferring railroad cars in boats or barges across the Mississippi river to or from any point in St. Louis. It would be difficult to conceive a scheme which could more effectually stifle competition and create monopoly.

3. Is a lease for 10 years a consolidation of the franchises or property, within the constitutional provision? It is contended that the term "consolidation" means a permanent union of the interests, management, and control of two roads, either in the formation of a new company out of the consolidated one, or else by consolidated management of the old ones unitedly while their distinct corporate entities still remained. This distinction is true in the general sense in which one speaks of the "consolidation" of railroads. The term may also mean the act of forming into a more firm or compact mass, body, or system. The constitutional convention, representing the people of the state, sought to provide against monopolies, and to preserve to the public the benefit that would accrue from competition between parallel or competing lines of railway. It sought for practical results. It intended to provide that parallel or competing lines should continue to be competing, and this it aimed to accomplish by prohibiting the consolidation of the stock or the franchises or the property of any such competing lines of railway. The union of such lines was prohibited, in view of the objects sought to be accomplished. The term "consolidate," we think, must be construed to have been used in the sense of "join" or "unite." To permit two such competing lines of railway under a single management and a single control would accomplish the very purpose which the constitution sought to prevent. We must have regard to the spirit and the object of that constitutional provision, and not juggle with the technical meaning of the word. The prohibition goes to the consolidation or uniting of the stock of two competing roads, or of the franchises of two competing roads, or of the property of two competing roads. The doing of either would create the prohibited monopoly, and either is within the intendment and meaning of the constitutional provision. Nor do we think that there is force in the contention that this union or consolidation was by means of a temporary arrangement, if thereby that is accomplished which is prohibited by the constitution. If it be lawful, by means of a lease for 10 years, to consolidate and unite the properties of competing lines of railway, we perceive no reason why a lease for 99 years would not be equally valid. We cannot draw the line in that respect between what is permanent and what is temporary. Whatever produces the prohibited result is obnox-

ious to the spirit and the letter of the constitutional provision, and is illegal. We must deal with the result accomplished, without regard to the means employed. It cannot be permitted that one may effect a prohibited result by indirection which he may not lawfully accomplish by direct means. We must therefore hold that the leases in question practically effected a consolidation of the properties of two competing lines, and are within the inhibition of the constitution. Morrill v. Railroad Co., 55 N. H. 531; Gulf, C. & S. F. Ry. Co. v. State, 72 Tex. 404, 10 S. W. 81; State v. Atchison & N. R. Co., 24 Neb. 143, 38 N. W. 43.

These leases being, then, invalid, the constitution imposed upon railroad companies an absolute prohibition to enter into them. They were absolutely void from their inception. It was ultra vires the corporations to enter into them. Being void, the covenants contained in them were of no binding effect, and no recovery can be had upon them. A railroad corporation cannot lease its line of railway without statutory power so to do. It certainly cannot when there is an express constitutional prohibition so to do. These contracts, therefore, being prohibited, are void ab initio, and no suit can be maintained upon them. Thomas v. Railroad Co., 101 U. S. 71; Pennsylvania R. Co. v. St. Louis, A. & T. H. R. Co., 118 U. S. 316, 6 Sup. Ct. 1094; Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 11 Sup. Ct. 478. In the latter case it is said: "The objection to the contract is not merely the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it." In Bank v. Hawkins, 34 U. S. App. 423, 18 C. C. A. 78, and 71 Fed. 369, we drew a distinction between acts of a corporation without power conferred upon it and those acts done in excess of conferred powers. We held that the latter acts were illegal as to shareholders, but that the corporation was liable therefor to innocent parties. The doctrine of that case, however, is shaken, if not overruled, by the decision of the supreme court in Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831. But, even under the doctrine as we declared it, we think the contract here in question would be held wholly beyond the authority of the corporation to make or to perform for any purpose; but, whether so or not, it is our duty to conform our judgment to the ruling of the ultimate tribunal. Here the appellee brings his suit upon this prohibited and void lease, and seeks to recover rentals due under it. He invokes the performance of a contract which is prohibited by the fundamental law of the state, and which neither the lessor nor the lessee had power or authority to make. He necessarily relies upon an illegal and void contract, and therefore he cannot recover. Miller v. Ammon, 145 U. S. 421, 12 Sup. Ct. 884; McCormick v. Bank, 165 U. S. 538, 17 Sup. Ct. 433; Bank v. Kennedy, supra. In McCormick v. Bank, supra, there is a suggestion that in such case there may be a recovery for the value of that actually received and enjoyed under the illegal contract. Whether that suggestion can be applied here, and whether jurisdic-

tion in equity can be sustained, are questions which we do not now consider or determine; the bill here containing no apt allegation upon which to decree in that regard. In reversing the judgment, as we must, we are disposed to do so with leave to the appellee, if he be so advised, to move the court below to amend the bill to charge the appellants, or either of them, for the value of the use of that received and enjoyed under the lease; reserving, however, the deter·mination of all questions not herein decided. The decree is reversed, and the cause remanded, with directions to the court below to dismiss the bill upon the merits, unless the appellee shall avail himself of the leave allowed.

Judge SHOWALTER took no part in the decision of this case.