## Commonwealth, on Relation of James Breathitt, Attorney General v. Louisville & Nashville R. R. Co. and Frankfort & Cincinnati R. R. Co.

(Decided June 21, 1911.)

### Appeal from Franklin Circuit Court.

1. Railroads—Parallel and Competing Lines—Constitutional Provision.—Under Section 201 of the Constitution the words "parallel or competing" are not to be read as "parallel and competing." A road that is either parallel or competing is within the inhibition of the Constitution.

2. Same—Purchaser.—The plan to build the road to a distant point which has been abandoned for many years, will not be considered in determining whether the road is a parallel or competing line; and it is not material that the purchaser owns a line which is in direction an extension of the line purchased, if it also owns a parallel and competing line.

3. Same—Through Trains—The fact that through trains are not operated on one of the lines is not material.

4. Same—Competing Line—When.—A road is a competing line if it furnishes competition by reason of its connection with another line although it does not own the connecting line.

5. Consideration By Courts.—Although the public will be better served, the court cannot take this matter into consideration, as the Constitution contains no exception, and the court cannot consider the fact that the line purchased cannot be profitably operated by an independent company.

JAMES BREATHITT, Attorney General, THEODORE B. BLAKEY, Assistant Attorney General and JNO. FRANCIS LOCKETT, Assistant Attorney General for appellant.

HENRY L. STONE, McQUOWN & BECKHAM for appellee,

Opinion of the Court by Chief Justice Hobson—
Reversing.

By an act approved March 18, 1871, the Frankfort,
Paris and Big Sandy Railway Company was incorpor-
ated, and authorized to construct a line of railway from
Frankfort by way of Georgetown, Paris and Owingsville
to a point at or near the mouth of the Big Sandy River.
At the same session of the Legislature another act was
passed incorporating the Paris, Georgetown and Frank-
fort Railway Company, which was authorized to con-
struct a railroad from Paris to Frankfort or to a point
on the Lexington and Louisville railroad near Frank-
fort as might be deemed best. Under the powers granted
to each of these companies, they were consolidated on
February 14, 1881, under the name of the Paris, George-
town and Frankfort Railway Company. Afterwards, by
an act approved February 24, 1888, the name of the com-
pany was changed to the Kentucky Midland Railroad
Company and it was authorized to extend its line or
lines of railroad to the eastern boundary of Kentucky
on the Big Sandy River along any route or routes it
might select. This company built a line of railroad from
Frankfort by way of Georgetown to Paris. The county
of Franklin, the city of Frankfort, and citizens of Frank-
fort subscribed for the stock of the road; so did Scott
County, Bourbon County and the city of Paris; and the
road was built by the aid of these subscriptions. The
subscription of the city of Paris was payable when the
road reached that point and was paid when the road was
built to Paris. The subscription of Bourbon County was
payable when the road was constructed to a certain point
east of the county, and the road not having been con-
structed beyond Paris, the subscription was not paid.
After the road had been constructed to Paris the com-
pany fell into financial difficulties. It owed the contrac-
tors who had built the road to that point about $600,000,
and it being unable to raise the money, finally a suit was
brought, and in that action the road was ordered sold.
It was purchased by the contractors who thereupon in-
corporated the Frankfort & Cincinnati Railroad Com-
pany on February 27, 1897, which operated the road
from that time on. In the year 1901 Charles E. Lewis,
of New York, bought from the owners for $325,000 all
the stocks and bonds of the Frankfort & Cincinnati Rail-
road Company. The organization of that company was
continued as it had been before and the railroad was

operated by it until the year 1909 when the Louisville & Nashville Railroad Company, for whom Lewis had bought the stocks and bonds in 1901, took over the property, and has since operated the road as a part of its system. The Louisville & Nashville Railroad Company, hereinafter called the L. & N., owns a line of railroad running from Covington through Paris to Lexington; also a line running from Lexington through Frankfort to Louisville. The line of the L. & N. Railroad from Paris to Frankfort by way of Lexington is 48 miles long; the line of the Frankfort & Cincinnati Railroad Company, hereinafter called the F. & C., from Paris to Frankfort by way of Georgetown is 40 miles long. The two lines are about 12 miles apart at their greatest divergence, and will average about 8 miles apart for the whole route. The F. & C. crosses at Georgetown the Cincinnati Southern Railroad which runs from Cincinnati to Chattanooga, and by means of this connection it furnishes to both Frankfort and Paris competition with the L. & N. as to all freight to be shipped either north or south. It also connects there with the Southern Railroad Company in Kentucky, which owns lines running from Louisville to various points south. Section 201 of the Constitution is as follows:

"No railroad, telegraph, telephone, bridge or common carrier company shall consolidate its capital stock, franchises or property, or pool its earnings, in whole or in part, with any other railroad, telegraph, telephone, bridge or common carrier company, owning a parallel or competing line or structure, or acquire by purchase, lease or otherwise, any parallel or competing line or structure, or operate the same; nor shall any railway company or other common carrier combine or make any contract with the owners of any vessel that leaves or makes port in this State, or with any common carrier, by which combination or contract the earnings of one doing the carrying are to be shared by the other not doing the carrying."

Section 769, Kentucky Statutes, also provides:

"Any company may build such spurs, switches, tracks or branches as may be necessary to conduct its business or develop business along its line of road, and for that purpose shall have all the powers and be subject to the same restrictions and liabilities as are conferred upon it for the construction of its main line; and may purchase the property and franchises of any other

railroad company at public or private sale, not a competing or parallel line; and may sell its franchises and property to any other company not a competing or parallel line or otherwise prohibited by law, to purchase, and may, unless prohibited by law, subscribe to the capital stock of any other railroad company organized under the law of this or any other State, with the assent of such company, and any company organized under the laws of this, or any other State, may, unless prohibited by law, subscribe to the capital stock of any company organized under this law, with the assent of such company, and may make any agreement or arrangement, not inconsistent with law, with any other railroad company.''

This action was brought by the Commonwealth on the relation of the Attorney General against the two railroad companies to enjoin the taking over of the F. & C. by the L. & N. and to annul what had been done between the two companies, on the ground that the two lines were parallel and competing; that the L. & N. could not under the Constitution acquire by purchase, lease or otherwise, any parallel or competing line, or consolidate its capital stock, franchise or property, or pool its earnings in whole or in part with any other railroad company owning a parallel or competing line, and that under section 769 of the statute, the power of the F. & C. to sell and the power of the L. & N. to buy, did not extend to a competing or parallel line. An answer was filed traversing the allegations of the petition, and voluminous proof was taken. The proof for the plaintiff showed these facts: The purpose of the incorporation and construction of the Kentucky Midland Railroad was to obtain competition in railroad rates at Paris, Georgetown and Frankfort, Paris and Frankfort having then only the L. & N. railroad and Georgetown only the Cincinnati Southern; that with this view the subscriptions of the city of Frankfort, Franklin County, Scott County and the city of Paris were made. It is further shown that these subscriptions were also made for the purpose of obtaining an outlet eastward through the coal and timber sections of the State, so that coal and timber might be brought into the cities named, and that it was not contemplated then that the road would stop at Paris. After the F. & C. was built and while it was operated, competitive rates were in force at Paris, Georgetown and Frankfort. The passenger rate from Frankfort to

Cincinnati before the F. & C. was operated was $4.00; this was lowered to $2.80 as soon as the road was put in operation, and has since so remained. There was a through tariff on coal from the Jellico district by way of the L. & N. or by way of the Cincinnati Southern, while the F. & C. was operated as an independent road. After the L. & N. took over the property, the through tariff was taken off and local charges were made. A similar increase in price was made on wheat shipped south, and on hemp, bluegrass seed and the like. Since the consolidation there has been more trouble to get cars than there was before. Switching charges are now added. This was not done before. The trains are not now so operated as to connect with the Cincinnati Southern, and stock intended for it, has to lie over. There is also evidence in the record tending to show that when there was difficulty in getting cars from one railroad the other would furnish them as long as there was competition between the L. & N. and the Cincinnati Southern for the business at Paris, Georgetown and Frankfort. As things now are the L. & N. has no competition to Paris or Frankfort, and the Cincinnati Southern has no other competition at Georgetown, as the Southern Railway in Kentucky is a part of its lines.

On the other hand, the proof for the defendant showed these facts: When the L. & N. took charge of the F. & C. the ties of the railroad were rotten, the trestles were much decayed, and the road was not safe for trains. Heavy cars and engines could not be run over it, and many persons were afraid to ride on the passenger trains. The road had never made any money. It had great difficulty to pay the interest on its bonded debt, $200,000, and to meet operating expenses. It had not had a surplus sufficient to keep the property in order. The F. & C. had two locomotives, two freight cars, two passenger cars and one caboose: it had no other rolling stock. When the L. & N. took over the road it spent about $3,300 on this rolling stock before it was considered fit to be further used on the road. It spent in new timber for the road in that year about $40,000, and a considerable additional expense is still needed, especially in the way of improvements at the depots, putting in stock pens and the like. One witness describes the road as a lame duck, another says its condition was the limit. Its operating expenses were about 84 per cent. of its earnings, and very little for ten years had

been put in repairs. The freight tonnage of the F. & C. between Paris and Frankfort was about 1 1-2 per cent. of its whole freight tonnage, and the passenger business was about in the same ratio. The proof for the defendant by a number of witnesses was to the effect that an independent company could not profitably operate the road. The L. & N. owns a branch running from Maysville to Paris. The F. & C. is practically in direction a continuation of this branch, and since the L. & N. took charge it has operated through passenger trains from Maysville to Frankfort connecting there with the trains to and from Louisville and the trains to and from Beattyville, thus greatly improving the passenger service along the line. It has also run fuller and larger freight trains, and has furnished to shippers along the road better conveniences than they enjoyed before. Frankfort has about twelve thousand people, Georgetown about six thousand, Paris about eight thousand, and Lexington about thirty-five thousand. It is, eighteen miles from Frankfort to Georgetown, twenty-two miles from Georgetown to Paris, twenty-nine miles from Frankfort to Lexington and nineteen miles from Lexington to Paris. A number of witnesses residing at Frankfort, Georgetown and Paris testify that it will be to the interest of the people at each of these cities and also to the interest of the public for the L. & N. to take over the F. & C. for the reason that the through trains give them advantages they would not otherwise have; that the L. & N. is putting the road in good shape, and making it both safe and serviceable to the public, and that if the rates can be controlled by law, it will be much to the interest of the public that the L. & N. be allowed to retain the road.

On these facts the circuit court held that the purpose of section 201 of the Constitution is to prevent the stifling of competition; that the words "parallel or competing" should be read "parallel and competing;" that the F. & C. was in such a condition that it was not able to do a successful business, and so it was not possible for it to compete for business with any other road; that it was not possible for an independent company to take charge of it and operate it so as to make money; that this had been tested for twenty years, and had failed; that the F. & C. could not offer any substantial competition, and that its existence could have no appreciable effect on the question of freight or passenger rates of other lines.

For these reasons he dismissed the petition. The Commonwealth appeals.

We can not concur with the circuit court in holding that the words "parallel or competing" in the constitutional provision should be read "parallel and competing." A constitutional provision is mandatory and there being nothing in the constitutional provision to show that the word "or" was used in the sense of "and," it is not permissible in so solemn an instrument as a State Constitution to substitute "and" for "or." It will be observed that the phrase occurs twice in the section. It is also repeated by the Legislature in section 769, Kentucky Statutes, with the difference that there it reads "competing or parallel." Two parallel lines of railroad are not necessarily two lines equidistant from each, but are lines running in one general direction, traversing the same section of country and running within a few miles of each other. Two lines are parallel when they run between the same two points or localities. (East St. Louis, etc. R. R. Co. v. Jarvis, 34 C. C. A., 639; State v. Montana R. R. Co., 21 Mont., 221; Penn. R. R. Co. v. Commonwealth, 7 Atl., 368.) It was perceived by the makers of the Constitution that if there were two lines of railroad between two localities there would be more or less competition between them, and so they provided that one should not buy the other. But they foresaw that competition might exist when the lines were not parallel, and so to preserve competition they prohibited one road from purchasing a competing line. If the line purchased is a parallel or a competing line, the purchase is within the inhibition of the Constitution.

It is insisted for the railroad company that the F. & C. is not a parallel line because the original plan was to construct a railroad from Frankfort eastward to the Big Sandy, and if the line had been built as planned, it would not be parallel to the lines of the L. & N. But as a matter of fact the design of building to the Big Sandy was abandoned more than twenty years ago. The F. & C. has simply owned and operated the road from Frankfort to Paris and the result of the case can not in any wise be affected by the design of the original corporation which began and built the road as far as Paris. It is also said that the line of the F. & C. should be regarded simply as an extension of the Maysville branch and not as a parallel line. It is not a parallel line to the Maysville branch, but it is

a parallel line to the line of the L. & N. from Paris to Frankfort by way of Lexington. The F. & C. being a parallel line to the railroad running from Paris to Frankfort by way of Lexington, it is not material that the L. & N. which owns this road also owns another branch which is not a parallel line. Nor is it material that the L. & N. does not run through trains from Paris and Frankfort by way of Lexington, but breaks up its trains at Lexington. This is a mere matter of operation and may be changed tomorrow. The two lines both run from Paris to Frankfort. The average distance between them is about eight miles, and it seems to us that they are clearly parallel lines within the meaning of the Constitution

It is insisted for the railroad company that the F. & C. of itself can not afford substantial competition, and that we can not consider the fact that it does afford competition by reason of its intersection with the Cincinnati Southern. We are referred to a nisi prius decision in South Carolina so holding, but we can not concur in the conclusion. As long as the F. & C. maintains a separate existence, Frankfort is a competitive point as to railroad rates; so is Georgetown, and so is Paris. When the L. & N. acquires the F. & C. neither Frankfort nor Paris will be a competitive point; for the only railroad running through them will be controlled by the L. & N. As long as the F. & C. is independent, shippers at Frankfort or Paris can get competitive rates to all points north, east, south or west, by reason of the F. & C. and its connections at Georgetown; and as long as the F. & C. is not controlled by the Cincinnati Southern, Georgetown will enjoy similar competitive rates. It was the plain purpose of the Constitution to protect the people of the State from the destruction of competition by one road buying another which afforded them this protection. It is not material how long the road is when it owns all the line necessary to furnish the competition. If, by means of its connecting lines, it furnishes competition, it is a competing line within the meaning of the Constitution. To hold otherwise would be to destroy the value of the constitutional provision; for in this event one strong corporation might buy some part of the connecting lines or some branch necessary to furnish transportation, and thus stifle competition in violation of the Constitution. When we take into consideration the connections of the F. & C. we think it evident that it does furnish

competition to the L. & N both at Frankfort and at Paris and also furnishes competition to the Cincinnati Southern at Georgetown. It is a substantial competition because otherwise these three cities would be just in the position they were before the road was built, and they made their subscription towards the road largely for the purpose of getting the competitive rates which the access to two lines of railroad would bring to them.

The evidence warrants the conclusion that all things considered the public will be better served by the L. & N. owning the F. & C. and operating it; and if we could take this matter into consideration we would concur in the judgment of the circuit court. But the constitutional provision contains no exception of this sort. To uphold the purchase on this ground would be to say that a purchase of a parallel or competing line may be made when under all the circumstances the public would be thus best served, while the Constitution provides that a parallel or competing line shall not be purchased. We can not add to the words of the Constitution or write an exception into its positive provisions.

It may be true that the F. & C. was a lame duck, or that its condition was the limit, still it was a going concern, and while it had little rolling stock, it was able to get all the rolling stock it wanted from one railroad or the other. If one did not furnish it the other would to get the business. It is true it could not have lived but for the liberal traffic arrangements it made with these roads, but both were interested in keeping it alive as a feeder of its lines, and each was anxious to get from it all the business it could. It is not material that an independent company can not operate the F. & C. profitably. The constitutional provision is applicable to all cases. It can not be limited to lines which may be profitably operated. Constitutional provisions are of no value unless enforced as written. If as thus enforced they work hardship the remedy must be applied by the people and not by the courts. To write into a constitutional or statutory provision words which the makers did not put there, is to unmake the law, not to enforce it, unless there is enough on the face of the instrument to show this to be its meaning. To give a constitution an elastic construction is to destroy its value, and defeat the purpose for which it was made. The purpose of a constitution is to establish certain fixed principles which shall control the State.

When the instrument is not read according to its terms, then the principles on which the State is conducted, will not depend upon the words of the instrument but upon the predilections of those in charge of it. Many of the South American States have Constitutions just as carefully drawn as ours, and they have failed in their purpose, not because they are not expressed in proper words, but because they have been given an elastic construction under which they have been made to mean what those in power wished them to mean. Whether this is done in the supposed interest of the public or in the interest of those in power matters not. In either event no one can tell what the Constitution means in advance, and its meaning will shift from time to time as the necessity of the case requires. The only safe rule is to enforce the Constitution as written, and to leave it with the people to amend the Constitution and to provide the remedy if it is found to work injustice.

When the F. & C. began business it had no rolling stock, not even a wheel barrow; it rented all the rolling stock it used. Its gross earnings from March 1 to June 1, 1897, were $16,490.01. For the following years up to 1901 its gross earnings were respectively as follows: 1897-98, $53,531.18; 1898-99, $60,107.71; 1899-1900, $67,314.80; 1900-01, $78,775.94. This brings us up to the time when the stock of the company was bought by Lewis for the L. & N. Its earnings since that time have been as follows: 1901-02, $84,908.45; 1902-03, $76,994.99; 1903-04, $78,296.00; 1904-05, $82,361.95; 1905-06, $95,589.53; 1906-07, $112,192.84; 1907-08, $106,019.56; 1908-09, $109,034.32. It will thus be seen that the earnings of the compony have steadily increased and that they are now something more than double what they were when the F. & C. began operating it, and out of its earnings paid the interest on its bonds, the rent of its rolling stock and current expenses. It also out of its earnings bought the rolling stock which it had when the L. & N. took it over. While these figures do not know that an independent company could operate the road so as to make a large profit, they do not show that the road can not with proper management be operated by an independent company. If experience should demonstrate that owing to the shortness of the road it can not be profitably operated by steam, it may be more satisfactorily operated as an electric line.

There are many circumstances shown in the record

demonstrating the importance of this road being operated as an independent line. The following is illustrative of others: A merchant in Frankfort needed twenty-seven cars to ship out sand. He applied to the agent of the L. & N. at Frankfort for cars and was told that it was absolutely impossible to get them. He then applied to the F. & C. and was told that it could get the cars through the Cincinnati Southern, and would have them here the next morning. The next morning the cars came, and the sand was shipped. The next day the general agent of the L. & N. called on the merchant and told him that the station agent had made a mistake that the L. & N. could furnish him cars whenever he needed them, and to let him know when he needed cars again. Millers on the L. & N. between Paris and Maysville have to haul their wheat or product to Paris and ship it from there as they are unable to get the same rate from their stations as are given at Paris. These are only given as illustrations. There are many such things proved in the record showing the wisdom of the constitutional provision, and the importance of it to the people of the State. If the judgment of the circuit court is sustained there will be no railroad communication with the Capital of the State except over the L. & N. The F. & C. was built to avoid this very thing.

In the year 1892, the L. & N. Railroad Company bought the Chesapeake, Ohio & South Western Railroad Company and its allied corporations. Thereupon a suit was brought by the Commonwealth to enjoin the L. & N. Railroad Company from taking over the property or owning or operating the railroads on the gound that the purchase was in violation of section 201 of the Constitution. This court held that they were parallel and competing lines and entered a judgment in favor of the Commonwealth as prayed in the petition. See L. & N. R. R. Co. v. Commonwealth, 97 Ky., 675. An appeal was taken from that judgment to the Supreme Court of the United States, and on the appeal the judgment was affirmed. (See L. & N. R. R. Co. v. Ky., 161 U. S., 677.) We do not see that this case can be distinguished from that.

Judgment reversed and cause remanded for a judgment as above indicated.