# Louisville & Nashville Railroad Company v. Carter.

(Decided November 25, 1927.)

(As Modified, on Denial of Rehearing, December 14, 1928.)

## Appeal from Franklin Circuit Court.

1.  Commerce.—Whether brakeman, injured while accompanying empty freight cars, was engaged in interstate commerce, held question for jury under conflicting evidence as to whether cars, which were being moved to junction within state, included car which had been moved on interstate trip.

2.  Commerce.—Under evidence that brakeman was injured while accompanying train consisting of empty box cars, to be carried by engine to junction within state for purpose of delivery to another railroad, jury was justified in finding brakeman was engaged in intrastate commerce, though same engine had been used to pull interstate shipment before it was uncoupled for switching operation.

3.  Appeal and Error.—Party who desires more ample definition in instructions should request additional instruction, and on failing to do so cannot complain that instruction given was inadequate.

4.  Appeal and Error.—Jury's verdict is final as to issue which they must necessarily have determined in arriving at verdict.

5.  Master and Servant.—In action by brakeman against railroad employing him, which was in receiver's hands, and another railroad for injuries, evidence that solvent road directed reorganization of plaintiff's employer, and controlled its policies and rules through dummy stockholders, held to make issue for jury of solvent railroad's liability for negligence of plaintiff's employer.

6.  Corporations.—Courts do not hesitate to ignore corporate fiction and to draw aside veil of corporate entity when necessary to reach justice and prevent fraud.

7.  Master and Servant.—Railroad owes train employees, who are not themselves charged with discharging railroad's duty of care, same duty of exercise of care to avoid collision with traveler on public crossing as it owes to persons not employees.

8.  Master and Servant.—Measure of railroad's duty to employees to exercise ordinary care to prevent collision at dangerous crossings is maintenance of warning device and statutory signals tending to prevent collisions.

9.  Master and Servant.—Where bell, required to be maintained by railroad in exercise of ordinary care to prevent collisions at dangerous crossing, became out of order, and so remained, railroad was not exercising duty of ordinary care owed to employees to prevent collision.

10. Master and Servant.—In action against railroad by brakeman injured in crossing collision, evidence of railroad's negligence in

permitting electric bell at dangerous crossing to remain out of order held to make issue for jury.

11. Master and Servant.—In brakeman's action against railroad for injuries in crossing collision, defense of railroad that employee assumed risk of injury, resulting from employer's negligence in failing to repair electric bell at dangerous crossing, held barred, where assumption of risk was not pleaded.

12. Limitation of Actions.—In brakeman's action against railroad for injuries, promise of railroad just after accident that, if brakeman would not immediately sue, it would pay his hospital and doctor bills and wages, if proved, was complete answer to defendant's plea of limitation.

13. Release.—In action by brakeman against railroad for injuries, question whether agreement whereby railroad paid brakeman's hospital and doctor bills, and kept him on pay roll, was in consideration of release or of promise to defer suit, held for jury.

14. Appeal and Error.—Where it was practically conceded that disrepair of crossing bell caused injury, instruction, in brakeman's action against railroad for injuries, that carrier had duty to maintain electric crossing bell in good condition, or use other means as ordinary care might require to prevent crossing collisions, if erroneous, held not prejudicial.

15. Trial.—In brakeman's action against railroad for injuries, instruction that jury, if it should find at all for plaintiff, should credit any finding by sum which had been paid him theretofore by way of wages, held not erroneous as ignoring defense of release, where such defense was submitted by another instruction.

16. Damages.—$15,000 damages to brakeman under 30 for broken leg, which had to be amputated, causing great pain and suffering, and resulting in permanent impairment of his power to earn money, previously earned at rate of $125 to $150 per month, held not excessive.

WOODWARD, WARFIELD & HOBSON, ASHBY M. WARREN and MORRIS & JONES for appellant.

LESLIE W. MORRIS and MARION RIDER for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

From a judgment in favor of the appellee in the sum of $22,895.25, subject to a credit of $7,895.25, for personal injuries received by him while working as a brakeman on a freight train which appellee claimed the appellant was then operating, the latter brings this appeal.

The appellee, for a number of years prior to the accident of which he complains, was an extra brakeman and extra fireman in the employ of the Frankfort & Cin-

cinnati Railroad Company, which we shall hereafter refer to in this opinion as the F. & C. The F. & C. extended from Frankfort, Ky., through Georgetown, Ky., to Paris, Ky. On August 26, 1921, the appellee was working as a brakeman on a freight train bound from Frankfort to Paris. The F. & C. possessed but one engine, and this engine was required to do all of the work which this railroad had to do, not only that of pulling its freight and passenger trains between termini, but also that of what little switching the road had to do. It is conceded that in the train which left Frankfort for Georgetown there was an interstate shipment, for which reason the appellee, while acting as brakeman at least on that train, was engaged in interstate commerce. When the train reached Georgetown, it stopped, and the engine was uncoupled.

What next happened is in dispute. The appellant claims that out of the train which came from Frankfort to Georgetown two empty box cars were removed, and then coupled to an empty box car which was standing at the Georgetown station. These three empty box cars were then pushed by the engine over to the Southern Railroad junction, about one-half mile away, for the purpose of delivery to the Southern Railroad. Appellant rests this claim on a conductor's report, which was filed by it over appellee's objection on the trial of this action, and which purported to cover the movement of this train from Frankfort to Paris. On this report there appears as moving in the train which left Frankfort box car "So. Ry. 16015." The appellant's conductor testified that he was on the cut of cars being pushed over to the Southern Railroad when the accident happened and was riding "on the third car from the end, which was Southern 16015."

From this appellant argues that it established that the three empty box cars being moved to the Southern depot comprised one of the cars that had moved from Frankfort to Georgetown, and, as this part of the trip was undoubtedly interstate, the character of the trip was therefore not changed by the movement from the Georgetown station to the Southern depot. On the other hand, the appellee, when put upon the stand in rebuttal, testified that these three empty box cars were picked up at Georgetown and pushed over to the Southern depot. There was earlier testimony to the effect that, when this

train reached Georgetown from Frankfort, the crew first set out the loaded freight car containing the interstate shipment referred to, then cut the engine off from the train and coupled it up "to these three cars (the empty box cars in question) ahead of us, and then pushed them toward the Southern depot."

Thus we see the proof as to where these three cars came from was in conflict. If the jury believed the appellant's proof, then it was bound to find that this was an interstate movement. But, if it accepted the appellee's proof, then, as these three empty box cars comprised no part of the train bound from Frankfort to Georgetown or Paris, and as their sole movement was from the Georgetown station to the Southern junction, entirely intrastate, and as it was not necessary that these cars be moved in order that the Frankfort to Paris train could proceed on its way, and as the F. & C., having but one engine, had to use it to move these three box cars, not for the purpose of expediting in any way the original journey on which this engine had started nor as any part of that journey, but only to perform a switching service in no wise connected with that journey, the jury was authorized to find, as it did, that appellee was engaged at the time of his accident in intrastate commerce. The court by instruction A peremptorily told the jury that, if the appellee was at the time of his injury engaged in interstate commerce, as defined in that instruction, then it should find for the appellant; but, if appellee was not so engaged in interstate commerce, then it should be governed in its decision by the other instructions given in the case.

No complaint is made that this instruction A, at least as far as it went, improperly defined interstate commerce. If the appellant under our practice desired any more ample definition of interstate commerce, it should have offered one, and this it did not do. Having failed to do so, it may not now complain of the lack of a more ample definition. Hatfield v. Payne, Agent, 195 Ky. 310, 242 S. W. 32. See, also, Kroger Grocery & Baking Co. v. Hamlin, 193 Ky. 116, 235 S. W. 4. Indeed, on this branch of the case, appellant does not even now criticize the instruction, except to the extent that it insists that the instruction was erroneous, because it was entitled to a peremptory instruction. Of course, appellant was entitled to a peremptory instruction only if the evidence

was undisputed that the movement of the three empty box cars at the time of the accident was an interstate movement. We have seen that where these box cars came from was in dispute. If they came from where the appellee said they did, the movement was an intrastate movement, as we shall presently discuss more fully. If they came from where the appellant said they came, the movement was interstate. This issue was submitted to the jury, and as they found a verdict for the appellee, which they could not have done, but for their finding that the cars moved as claimed by the appellee, their finding is final on such disputed issue. In this the instant case is governed by that of L. & N. v. Parker's Adm'r, 242 U. S. 13, 37 S. Ct. 4, 61 L. Ed. 119.

Now, while the engine was pushing these three empty box cars from the Georgetown station to the Southern junction, the train collided at Penn's crossing with an automobile. The evidence shows practically without contradiction that this public crossing was a very dangerous one, for which reason the F. & C. had erected a crossing bell there. This bell was out of order at the time of the accident and had been so for a couple of weeks. The collision was undoubtedly caused because of the failure of this crossing bell to ring and so warn the oncoming automobile of the approach of the train. As a result of this collision the box cars were derailed, throwing the appellee, who was riding on the top of one of them, into an adjacent field, breaking his leg. He was confined in the hospital from the 26th of August, 1921, to the 19th day of the following November, when he was allowed to go home, but he had to return to the hospital on the 15th day of December, and was not discharged until the 22d day of the following January. During this time he suffered very great pain, and underwent five operations in the effort to save his leg, but to no avail. The leg finally had to be amputated five and one-half inches from the center of the knee cap.

After the appellee was hurt, the F. & C. kept him on the pay roll, and continued to pay him his salary just as though he was working for it. It also paid his hospital bills. Under just what circumstances these payments were made is in dispute, and we will refer to this matter later on in this opinion. These payments amounted to the sum of $7,895.25, which is the credit given on the verdict as hereinbefore mentioned. In October, 1925, the

F. & C. went into the hands of a receiver, whereupon the appellee brought this suit against both the F. & C. and the appellant, Louisville & Nashville Railroad Company, to recover for the injuries he had received. The appellant was made a party to this suit on the theory that in fact and in truth it was operating the railroad between Frankfort and Georgetown at the time appellee was injured under the alleged fiction of the F. & C. corporate entity. We are therefore met at the outset of this case with the question whether or not the appellant is responsible for the appellee's injuries, conceding for the nonce that the F. & C. would be so. This question necessitates a more elaborate statement of the facts than has so far been given. Many years ago the people of Franklin, Scott, and Bourbon counties, desirous of obtaining freight and passenger competition for the benefit of their communities, built the F. & C. It was financed largely through a bond issue. The capital stock of the F. & C. road consisted of 1,600 shares, of the par value of $25 per share. The road at first was successfully operated. The appellant, operating a line from Frankfort through Lexington to Paris, was a competitor. In 1901, Chas. E. Lewis, representing the appellant, bought in the entire capital stock of the F. & C., and finally transferred this stock to the appellant, which remained the undisclosed owner of it until the year 1909. About this time the appellant caused the F. & C. to execute to it a deed embracing all of its property, including its rolling stock and terminals. The deed covering this property was duly placed to record, and the board of directors of the F. & C. elected by the appellant installed as officers of the F. & C. the same officers as those of the appellant. A suit was then brought by the Attorney General of the state to compel the appellant to give up the ownership of the F. & C. on the ground that under our Constitution it had no right to own a parallel and competing line.

This case finally found its way to this court, which held that the appellant could not own, control, or operate the F. & C., and ordered the appellant to dispose of it. Commonwealth v. L. & N. R. Co., 144 Ky. 324, 138 S. W. 291, Ann. Cas. 1918A, 633. Pursuant to the judgment entered in this case, the appellant reconveyed to the F. & C. a part of the property which had theretofore been conveyed by the F. & C. to it, and then submitted to the Franklin circuit court a plan of reorganization whereby

the appellant apparently sold to Chas. E. Hoge 801 shares of the capital stock of the F. & C. for a stated consideration of $10,012.50, to be paid in ten equal annual installments evidenced by notes bearing 4 per cent. interest, with the stock so purchased attached as collateral. The trial court approved the plan of reorganization, and an appeal was taken to this court. The appellant, through its attorneys and agents, procured the various communities at whose instance the litigation had been started to approve the reorganization plan and to request the Attorney General to dismiss the appeal. The appellant and the F. & C. paid a fee of $150 to the attorney representing the protestants under his guarantee that there would be no appeal perfected from the judgment of the Franklin circuit court approving the reorganization. The L. & N., through its representatives, also procured the consent of all the newspaper correspondents in Frankfort to keep the order of dismissal of the appeal out of the papers, which was done. The appellant then transferred a sufficient number of shares to various gentlemen to qualify them as directors of the F. & C., taking their checks for the sale price of the shares with the shares attached as collateral. These checks were never cashed. The evidence overwhelmingly shows that the stock at this time was worthless, or practically so, and there can be no doubt whatever that these directors and their successors never intended to purchase the stock, and were in truth and in fact dummy directors. From time to time, as the directorate was changed, the retiring directors would surrender their stock, and their checks would be surrendered to them, and then the stock would be issued to other gentlemen who took their place as directors, these gentlemen giving their checks in the same fashion as did their predecessors.

Mr. Hoge, to whom the 801 shares were transferred, was an excellent business man of Frankfort. In selling him the stock, the L. & N. guaranteed that the dividends to be paid on the stock would equal the interest on Mr. Hoge's notes. At that time all people knew that the stock was worthless, and the F. & C. was not earning even the interest on its bonded debt. Mr. Hoge was never compelled to pay any interest or any principal of the debt, and on his death, at the request of his son, Mr. French Hoge, the appellant released its claim against the Hoge

estate on the Hoge notes, and substituted Mr. French
Hoge in place of the deceased.   Still later, when Mr.
French Hoge desired to be relieved of this liability, if
such it can be called, the appellant substituted Mr. Har-
rison Hunter of Louisville, Ky., who bought this stock of
a bankrupt road for the consideration mentioned with-
out any investigation whatever.   The evidence leaves no
room for doubt but that the so-called sales of the 801
shares to the Messrs. Hoge and Hunter were but a pre-
tense and a sham, and that in fact and in truth the appel-
lant was at all times the owner of this stock.   Through-
out the period from 1912, until this road went into the
hands of a receiver in 1925, the evidence overwhelmingly
establishes that in truth it was the appellant which was
operating this road under the corporate fiction of the
F. & C. name.   The president and general manager of the
F. & C., Mr. Manning, was made such at the instance of
the appellant.   As such he took no action involving any
matter of policy without first consulting the officers of
the appellant.   Practically all of the office supplies of the
F. & C. were furnished by the appellant.   Mr. Manning
reported monthly to the appellant the conditions on his
road.   When any new rolling stock was needed, requisi-
tion was made on the appellant, and the latter furnished
it.   The rules governing the operation of the trains were
furnished by the appellant.   When money was needed to
pay operating expenses, Mr. Manning withheld without
objection the freights ostensibly due from the F. & C. to
the appellant.   Coal was furnished the F. & C. by the
appellant without being weighed.   When the accident out
of which this suit arose occurred, it was the appellant's
claim agents and investigators who were sent to look into
the matter.   Finally, just prior to the receivership suit,
the appellant caused Mr. Manning to make application
to the Interstate Commerce Commission for permission
to abandon the road.   If there ever was a case of the
hands of Esau and the voice of Jacob, this was one.   The
appellant insists that the mere ownership of all of the
capital stock of one corporation by another does not
render the latter corporation responsible for the liabili-
ties or acts of the owned corporation.   Whether that
proposition of law be true or not, it certainly has no ap-
plication to the facts of this case.   This question of
whether the appellant was the real party in interest was
submitted to the jury under appropriate instructions,

and the evidence leaves no doubt whatever that its finding that the operation of the F. & C. under the fiction of its corporate entity was but a sham and pretense on the part of the appellant to avoid and to get around the judgment of this court in the case we have above referred to is correct. The appellant was in truth and in fact operating the F. & C. as much as it was operating its road from Frankfort through Lexington to Paris. Courts do not hesitate to ignore the corporate fiction and to draw aside the veil of corporate entity where necessary to reach justice and prevent fraud.

In State v. Standard Oil Co., 49 Ohio St. 137, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541, the court said:

"So long as a proper use is made of the fiction, that a corporation is an entity apart from its shareholders, it is harmless, and, because convenient, should not be called in question; but where it is urged to an end subversive of its policy, or such is the issue, the fiction must be ignored, and the question determined, whether the act in question, though done by shareholders—that is to say, by the persons united in one body, was done simply as individuals and with respect to their individual interests as shareholders, or was done ostensibly as such, but, as a matter of fact, to control the corporation and affect the transaction of its business, in the same manner as if the act had been clothed with all the formalities of a corporate act. This must be so, because the stockholders having a dual capacity, and capable of acting in either, and a possible interest to conceal their character when acting in their corporate capacity, the absence of the formal evidence of the character of the act, cannot preclude judicial inquiry on the subject. If it were otherwise then, in one department of the law, fraud would enjoy an immunity awarded to it in no other."

In Thompson on Corporations (3d Ed.), sec. 10, it is said:

"The courts will certainly refuse to recognize the doctrine of separate entity where its recognition would operate as a shield for fraudulent or criminal acts, or be subversive of the policy of the state. Courts of equity will look through forms to the sub-

stance of things and ignore the fiction to preserve the rights of innocent parties. This may be done in cases where one corporation is owned or controlled by another corporation. But it would seem that the separate identity will be respected unless the holding or controlling company is a mere sham.''

In the case of U. S. v. Lehigh Valley R. Co., 220 U. S. 257, 31 S. Ct. 387, 55 L. Ed. 458, the crrier was enjoined under the commodities clause of the Hepburn Act (34 Stat. 584) from transporting coal of a corporation whose stock the carrier owned; the bill alleging that the coal company was a mere instrumentality of the carrier. See, also, Davis, Agent, v. Alexander, 269 U. S. 114, 46 S. Ct. 34, 70 L. Ed. 186.

In Commonwealth v. Southern Ry. Co., 193 Ky. 474, 237 S. W. 11, we said:

"In the light of the foregoing authorities, and many others which could be cited, and looking at the proposition from a logical and common-sense standpoint, we cannot escape the conclusion that in each of the years involved defendant Southern Railway Company was the owner of and actually operated the lines of the 'Southern Railway Company in Kentucky,' not in its name, but in that of the latter company, which latter fact was the shadow, but the actual operation was the substance. Defendant could not have more effectually operated these lines if it had done so in its own name. Every act looking to the control and management of them during the times mentioned was set in motion and actually executed by the same brains which conducted the operation of its admittedly owned lines, and the income from the Kentucky operation was sent to and presumably disbursed by the same officer who received and disbursed the income from the Southern Railway system proper. The defendant gave out to its stockholders and announced to the traveling public that it owned the lines of the 'Southern Railway Company in Kentucky,' and to allow it to escape taxation on its just proportion of its intangible property subject to taxation in Kentucky, because of the mere shell or hull in whose name it was operating its Kentucky division would not only be surrendering the substance to the shadow, but would

demand of us that we shut our eyes to the facts, and to thus permit one whom the statute was intended to reach to escape taxation through the disguise produced by the figment of the Kentucky corporation, and to thereby enjoy in this commonwealth special privileges not allowed to individuals without contributing its just proportion to the burdens of government. This is a practical age in which we live, and facts are regarded more than fiction, and courts recognize things as they are, and not as they appear when clothed in a disguised garb.''

See, also, Southern Railway Co. v. Thomas, 90 S. W. 1043, 28 Ky. Law Rep. 951; Chesapeake Stone Co. v. Holbrook, 168 Ky. 128, 181 S. W. 953, L. R. A. 1916D, 311. In 1 A. L. R. 612 et seq., and 34 A. L. R. 599 et seq., may be found a further collection of authorities on this point.

The operation of the railroad between Frankfort and Paris under the corporate fiction of the F. & C. entity being but a sham to avoid the effect of this court's ouster decision, and the appellant in reality being the operator of the road, it follows from what we have said that it is responsible to the appellee in this case in the same fashion as the F. & C. would have been.

This being true, did the appellee here, by resting his case on the failure of the crossing bell to ring, establish any breach of duty owing him by the appellant? The appellant insists that it was under no duty to maintain a crossing bell for the appellee; that the duty to maintain such a bell was one owing only to the traveling public. The appellant, however, has not analyzed what is the real issue here present. The appellant must concede that it owed as much a duty to its employees on the train not charged with the discharge of such duty to exercise ordinary care to avoid colliding with a traveler on a public crossing, by reason of which the employees might be injured, as it did to the traveler to avoid colliding with him whereby he might be injured. The duty was to avoid the collision. Now in the discharge of that duty it was incumbent on the carrier to exercise ordinary care. Due to the dangerous condition of this crossing, ordinary care required the appellant, in addition to the ordinary statutory signals, to maintain a crossing bell or some other device reasonably calculated to warn the public of the approaching train. The sole purpose of such a device

was to avoid a collision. The duty to exercise ordinary care was owed as much to the employee as it was to the public. The measure of this duty was the maintenance of some warning device in addition to the statutory signals that would reasonably tend to prevent collisions. Therefore, when the device maintained became out of order, and remained out of order, the carrier was not exercising ordinary care to avoid a collision, and for such failure the employee had a right to maintain this action. It was so held in the case of Cleveland, C., C. & St. L. R. Co. v. Mann, 76 Ind. App. 518, 132 N. E. 646.

The case of Randall v. B. & O. R. Co., 109 U. S. 478, 3 S. Ct. 322, 27 L. Ed. 1003, relied on by appellant, does not militate against this conclusion. The duty to avoid colliding with a traveler on a public crossing whereby injury to him or employees on the train might result was not involved. There a brakeman was unlocking a switch in the tracks in the yard, and was injured by a train striking him. The court said the statute of West Virginia on which the plaintiff relied in that case had no application, since there was no evidence that the engine which struck the plaintiff was about to cross the highway. The case of Greshem's Adm'r v. L. & N. R. Co., 24 S. W. 869, 15 Ky. Law Rep. 599, is likewise not in point. The statute there involved required railroads which crossed each other to stop their trains before crossing the other's tracks. This duty was obviously imposed for the benefit of those on the trains. Greshem was not within that class. The cases of Carper v. Receivers of N. & W. Ry. Co. (C. C. A.) 78 F. 94, 35 L. R. A. 135; Newsom's Adm'r v. N. & W. Ry. Co. (C. C.) 81 F. 133, and Gill v. L. & N. R. Co. (C. C.) 160 F. 260, relied on by appellant, may be grouped and considered together. In all of them the court held that a failure of a carrier to fence its right of way, as required by statute, whereby stock got out on the tracks and was run into by a train, causing such train to be derailed, thereby injuring one of the trainmen, did not give such trainmen a cause of action under such fencing statute. In all of these cases, the courts held that it was plainly the intention of the Legislature to vest a cause of action for violation of the statute, causing injury only in the owner of the stock. These cases say that there was no common law duty on the carrier to fence its right of way. It owed no duty to trespassing animals, except to exercise ordinary care to

avoid hitting them after their peril was discovered. But the fencing statutes made the carrier liable to the owner of the stock, if it failed to fence its right of way as the statute directed. This put a duty on the carrier which it was not under at common law. In the absence of a fencing statute, had the train hit a trespassing animal whose peril the trainmen had not discovered, until too late in the exercise of ordinary care to avoid hitting it, the carrier would have been responsible neither to the owner of the stock nor to its trainmen. The presence of the fencing statute did not enlarge any duty the carrier owed to its trainmen. It only enlarged the obligation of the carrier to the owner of the stock.

The present case is entirely unlike these fencing cases. Here the carrier owed the common-law duty to avoid a collision on a public crossing, which duty it owed to the traveler and its trainmen not concerned with the discharge of that duty. The maintenance of the bell was not imposed by statute, but was a measure of the requirement of the exercise of ordinary care to avoid a collision at this public crossing. This measure was as plainly applicable to the trainmen to whom the duty was owing as it was to the traveler. We are therefore of opinion that there was ample evidence to go to the jury in this case on this question of negligence on the part of the appellant. Conceding this, however, we must then determine whether or not appellee is barred because of the claim of "assumption of risk." He admitted that he knew for two weeks prior to the accident that this crossing bell had been out of order, for which reason appellant argues that he assumed the risk. In answer to this the appellee contends, and we think correctly so, that the appellant may not rely on this plea of assumption of risk because it was not pleaded. The appellant insists, however, that under the case of L. & N. R. Co. v. Lewis, 211 Ky. 830, 278 S. W. 143, it was not necessary to plead the defense of assumed risk. We there held that, where the risk was an ordinary risk of employment it was not necessary to plead affirmatively the defense of "assumption of such risk." The reason for this rule is obvious. The employer is not negligent, where the ordinary risks of employment are concerned. He is under no duty to protect the employee against such ordinary risks, and therefore, on a traverse of a plea of negligence, the employer may show that the employee was injured by an

ordinary risk to protect against which the employer was under no duty. But that is not this case. The risk claimed to be assumed here arose by reason of the employer's negligence. The employer is negligent. The employee knows of such negligence, and, despite such knowledge, continues to work without complaint. Such assumption is necessarily grounded on the fact that the employer is negligent. Such an assumption of risk must be pleaded if intended to be used as a defense.

In 39 C. J. 953, it is said:

> "This (the plea of assumption of risk must be specially pleaded) is undoubtedly the rule where the risk is an extraordinary one created or enhanced by the master's negligence and which the servant voluntarily assumes by continuing in the employment with actual or constructive knowledge of the defect and danger."

A long list of cases cited support the text. Appellant insists, however, that, although this may be the state rule, it is not the federal rule, and that in cases arising under the federal Employers' Liability Act (45 U. S. C. A. secs 51-59; U. S. Comp. St. secs, 8657-8665) assumption of risk of whatever character may be relied upon. although not pleaded. We need not inquire whether such is the federal rule or not, since, as we have seen, the jury found that the appellee, at the time he was injured, was engaged in moving the three empty box cars from the Georgetown station to the Southern depot, and this was an intrastate movement. Under the jury's finding, the cars thus moved were not a part of the train which started out from Frankfort to Georgetown. The movement of these cars was not connected with, and had nothing to do with, the promotion of the movement of the train from Frankfort to Paris. The engine on the Frankfort to Paris train was simply detached from that train, and used to move these cars because there was no other engine on this road to do that work. These cars moved only one-half mile, and entirely within the state of Kentucky. It therefore follows that the cases of Youngstown & Ohio R. Co. v. Halverstodt (C. C. A.) 12 F. (2d) 995, and New York Cent. & H. R. R. Co. v. Carr, 238 U. S. 260, 35 S. Ct. 780, 59 L. Ed. 1298, are not controlling, for in those two cases the switching movement involved was necessarily coupled with the movement of the

train concededly interstate. This case is rather governed by that of Illinois Central R. Co. v. Behrens, 233 U. S. 473, 34 S. Ct. 646, 58 L. Ed. 1053, Ann. Cas. 1914C, 163. The appellant's contention, then, that it was unnecessary under the federal statute to plead "assumption of risk" is not applicable. In holding that the movement here involved was an intrastate movement, we necessarily dispose of appellant's contention regarding the statute of limitations. Appellant's theory is that, as more than two years had elapsed from the time of appellee's injury before the filing of his petition herein, he no longer had a cause of action, because under the federal statute the limitations is a part of the right, and, after the statutory period within which to bring suit has expired, the right is gone.

Whether or not appellant is correct in this contention, or whether or not such a contention could be successfully refuted by a plea of estoppel, such as was here presented, we need not inquire, because, as stated, we are of the opinion that the appellee was engaged in intrastate commerce at the time of his accident. On this idea, appellee, in answer to the appellant's plea of limitations, replied that the appellant had through the F. & C. promised him first after his accident that, if he would not immediately sue, it would pay his hospital and doctor's bills, keep him on the payroll, and would later on settle his claim; that it continued to make such promises from time to time and up to when the F. & C. went into the hands of the receiver, and that appellee, in reliance on these promises, had not brought suit. This estoppel pleaded by the appellee, if sustained by the proof, was a complete answer to the plea of limitations. Chesapeake & Northern R. Co. v. Speakman, 114 Ky. 628, 71 S. W. 633, 24 Ky. Law Rep. 1449, 63 L. R. A. 193. Appellant seems to think this case was overruled by the recent case of Thompson v. Wisconsin Steel Co., 214 Ky. 221, 282 S. W. 1081, but that is not so. In the Thompson case there was a clear contract of settlement. The terms of the settlement were definite and certain, except as to the amount to be paid. That amount was not left to the caprice of the parties, but, on the contrary, a definite standard whereby such amount was to be measured was set up in that contract. The agreement pleaded in that case was a complete substitute for the original cause of action. In the Speakman case, however, there were no

definite terms of agreement, but only one to settle a claim at some time in the future, which agreement was too indefinite and uncertain to be enforced in court as a contract, but sufficiently so as to operate as an estoppel against the railroad. The agreement here pleaded was of the character of the agreement in the Speakman case, and not of the character of the agreement in the Thompson case. Although the evidence was contradictory as to whether or not any such agreement as appellee pleaded had been made, yet the issue was properly submitted to the jury under appropriate instructions, and its finding cannot be said to be against the evidence on this point.

Appellant makes a great many complaints of the instructions. Most of these complaints are grounded on its theory that the appellee was hurt while engaged in interstate commerce. This we have seen is incorrect, and, this being so, such criticisms necessarily fall. Some of its criticisms are directed to the instructions on the idea that there was no evidence to show that the F. & C. was in fact and in truth but an alter ego of the appellant. Whether it was so or not was suitably submitted to the jury, and, as we have pointed out in the earlier portion of this opinion, the evidence overwhelmingly sustains that finding.

Appellant also complains of instruction No. 2 because the court said that it was the duty of the carrier to maintain at Penn's crossing an electric crossing bell in good condition and repair, "or to use such other means as ordinary care might require to prevent vehicles and trains from colliding on the crossing." Conceding, without deciding, that the appellant is correct in claiming that under the pleadings in this case, which relied only on the failure of the appellant to maintain the crossing bell in good repair as constituting negligence, the trial court should not have used the expression "or used such other means as ordinary care might require to prevent vehicles and trains from colliding on the crossing," we are yet of the opinion that under the facts of this case the insertion of these words in the instructions was not prejudicial. As we read the record, there was practically no dispute but that the collision on the crossing was occasioned by the failure of this crossing bell to ring, and so warn the driver of the automobile with which this train collided of its approach. It was not denied that the crossing bell was out of order and had been so for over

two weeks. It is very hard to see how there was much, if any, issue to submit on the question of how this accident happened, for which reason the complained of expression was plainly not prejudicial.

The instruction on damages is complained of because the court there told the jury that, if it should find at all for the appellee, it should credit any finding by the sum which had been paid him theretofore by the F. & C. by way of wages and salary. Appellant insists that this payment was made as a settlement of appellee's claim, whatever it was. However, this point was in dispute. Under instruction No. 1 the appellee could not recover at all, unless the payments made were only paid by the way of credit. If they were not so paid by way of credit, appellee under this instruction had no cause of action. Instruction No. 4 therefore, when read in the light of instruction No. 1, is not subject to the criticism which appellant now makes. Other minor criticisms are made of the instructions, but they are without merit.

Appellant lastly contends that the verdict is excessive, and says that no verdict for the loss of a leg amounting to $22,895.25 can be found in our reports. Appellant, however, must remember that of this amount $2,059.25 was for the actual expenses of the appellee incident to his injury; $5,756 represents what his pay would have amounted to from the time he was injured until he brought suit. It is shown that he was unable to work during all of that time. Hence this sum really represents compensation for his loss of time. The $15,000 remaining covers the pain and suffering of the appellant, together with the permanent impairment of his power to earn money. It is shown that the appellant underwent five operations before his leg was finally amputated, and that he endured great suffering during that time. The fact that he has been unable to work for so many years, is a good indication of what the future has in store for him. He is less than 30 years of age, and has a long expectancy of life. He was at the time of his accident earning between $125 and $150 a month. Under all of these circumstances we cannot say that $15,000 is an excessive amount for such pain and suffering and such impairment of the power to earn money.

Perceiving no error prejudicial to appellant's substantial rights, the judgment herein is affirmed.

Whole court sitting.