# Hermitage Land & Timber Co. v. Scott's Executrices

(Decided Feb. 21, 1936)

WOODWARD, HAMILTON & HOBSON and LESLIE W. MOR-RIS for appellant.

POLK SOUTH, JR., and ALLEN PREWITT for appellees.

OPINION OF THE COURT BY JUDGE STITES—Affirming.

This is an appeal from a judgment of the Franklin circuit court, entered pursuant to the verdict of the jury in the sum of $6,200 in favor of Howell P. Scott against the appellant, Hermitage Land & Timber Company. Pending the appeal, Mr. Scott died, and.

the appeal has been revived against his executrices.

In 1917 Messrs. Eli H. Brown, Jr., and Charles Irion organized the Fibrecraft Chair Company, in which they owned all of the stock with the exception of three qualifying shares issued to an employee. In 1924 the Fibrecraft Chair Company purchased the old Hermitage Distillery property in South Frankfort. In 1926 Messrs. Brown and Irion organized the Hermitage Land & Timber Company, a Kentucky corporation, appellant here. They capitalized this company at $100,000, divided into shares of the par value of $100, and issued 3 shares to Mr. Irion, 3 shares to Mr. Brown, and 991 shares to the Fibrecraft Chair Company. The 3 remaining shares were never issued, although the stock book indicates that they were made out to an employee. The distillery property was conveyed to the Hermitage Land & Timber Company in exchange for the stock.

Repeated attempts were made during the period following the purchase of the property to sell it to the commonwealth. In March, 1933, Mr. Scott, who was a real estate agent in Frankfort, approached Mr. Brown and suggested that he list the property with him for sale. After some negotiation, the following contract was entered into:

Contract

"We, the Hermitage Land & Timber Company, of Frankfort, Franklin County, Kentucky, party of the first part, and Howell P. Scott, of Frankfort, Franklin County, Kentucky, party of the second part, have this the 21st day of April, 1933, entered into an agreement as follows, towit:

"The party of the first part does hereby employ the party of the second part as its sole and exclusive agent for a period of ninety (90) days from date indicated above, to sell for them the property owned by them in the City of Frankfort, Kentucky, located in the Eastern part of South Frankfort, and being the same property purchased by them from the W. A. Gaines & Company, and being the entire property of the Hermitage Distilling Plant.

"The agreed asking price is one hundred thousand dollars but the parties of the first part

agree to pay to the party of the second part, in the event that he sells the property or sends to them a buyer or in any way directing or calling their attention to a buyer, five per cent on the first ten thousand dollars and three per cent on all over and above that amount, as his commission for making the sale.

"It is further agreed that the five and three per cent commission shall be paid on the actual price paid by the purchaser for the entire property. This commission to be paid to the second party out of the first money collected.

"It is agreed between the parties hereto that there is excluded from this contract any sale to the Commonwealth of Kentucky, or any department thereof, and the party of the second part shall not attempt to make a sale of said property to the Commonwealth of Kentucky or any of its departments.

"If the party of the second part has not succeeded in making a sale of said property within ninety (90) days from this date, he shall file with the party of the first part a written list of those he has negotiated in good faith for a sale of this property, and if the party of the first part shall within twelve (12) months from this date and after the expiration of this contract sell said property to any of the prospects whose names the party of the second part has filed with the party of the first part then the party of the first part shall be liable to the party of the second part for his real estate commission as provided herein.

"The parties of the first part agree to make good and sufficient warranty deed to said property.

"Witness: the signatures of the parties hereto, this the day and date first above written.

"Hermitage Land & Timber Company,
"Eli H. Brown, Jr., President
"Chas. Irion, Secy-Treas.
"Howell P. Scott"

As a result of the boom in the price of old distillery properties arising in the late spring of 1933, the prospects of obtaining a price better than $100,000 became much brighter, and on July 7, 1933, Mr. Brown

wrote Mr. Scott to the effect that he was withdrawing his authority to quote the property at a price of $100,000 or to sell at any price "until the matter has been further discussed between us." The proof indicates that at the time this order was written, Mr. Brown was negotiating with various prospective purchasers, but that he and Mr. Irion were not in agreement as to terms or prices. Mr. Brown was apparently directing his efforts toward negotiations with a Chicago firm of investment bankers, through one A. J. Hoffman, which Scott and other witnesses claim was not financially able to pay the price of $200,000 then being asked by Mr. Brown. The Allied Brewing & Distilling Company became interested in the property and undertook to purchase it through a real estate agent in Louisville for $150,000. Counsel for the Allied testified that he was not satisfied with the authority of the Louisville real estate agent to act for the Hermitage Land & Timber Company, and the attorney representing Mr. Irion in the matter advised him of the agency contract held by Mr. Scott. This was some days after the letter written by Mr. Brown to Mr. Scott withdrawing his authority to sell until further discussion. Counsel for the Allied made an engagement to meet Mr. Scott in Louisville, where Mr. Scott went *in company with Mr. Irion.* An offer of $150,000 for the property was made to Mr. Scott, which he declined to accept, and countered with an offer to sell for $200,000. The following day, which is fixed as July 19th, Mr. Scott was *advised by Mr. Irion* that the Allied had authorized its attorney to pay $195,000 for the property, and the closing of the transaction at that price was recommended by him. Mr. Scott then made a written offer to the Allied to sell for $195,000 cash, and this offer was accepted.

Mr. Brown testifies that under date of July 13, 1933, he entered into an agreement to sell the property to A. J. Hoffman at a price of $200,000, on terms of $10,000 cash upon delivery of the deed, and the balance payable in 30, 60, and 90 days thereafter. The Allied brought a suit in the United States District Court praying specific performance of its agreement made through Mr. Scott. Following these transactions and numerous others not necessary to set out here, all of the parties met, and an agreement was entered into consenting on behalf of the Chicago invest-

ment bankers that a deed might be made by the Hermitage Land & Timber Company to A. J. Hoffman. At the same time, a deed to Hoffman was prepared and executed, pursuant to resolutions of the stockholders authorizing conveyance. Contemporaneously with these transactions, A. J. Hoffman and wife contracted to convey the same property to the Allied in consideration of $200,000. Deed was actually executed on September 14, 1933. It is claimed by Mr. Scott that the transactions alleged to have been made with Hoffman were not in good faith and that the contract between Mr. Brown and Mr. Hoffman was antedated in order to prevent the collection of his commission on the trade. It is shown in evidence that at the meeting on September 12th the suggestion was made that the Hermitage Land & Timber Company convey directly to the Allied, and that Mr. Brown refused to follow this procedure, giving as his only reason that he desired to avoid the payment of a commission to the real estate agents.

It is insisted by appellant that the contract with Mr. Scott was not authorized because, under the provisions of section 883b-3 of the Kentucky Statutes, the consent in writing by the holders of not less than three-fourths of the capital stock of the vendor corporation was essential to a valid sale, and, by parity of reasoning, was essential to permit the making of the contract authorizing Mr. Scott to sell. Elk Valley Coal Co. v. Thompson, 150 Ky. 614, 150 S. W. 817. It can hardly be denied, and we do not understand that appellant disputes, that if Brown and Irion owned all of the capital stock of the Hermitage Land & Timber Company, their signatures on the contract with Mr. Scott would be a sufficient compliance with the requirement of written consent in section 883b-3. Harris v. Moreland Motor Truck Co. (C. C. A. 9) 279 F. 543. It is argued, however, that the Fibrecraft Chair Company was the owner of more than three-fourths of the capital stock in the Hermitage Land & Timber Company and that its formal corporate consent was essential to the validity of the contract. The effectiveness of this argument must depend on whether or not the court may, under the circumstances here presented, look through the corporate veil to see the stockholders of the Fibrecraft Chair Company, who are the same Messrs. Brown and Irion. It cannot be doubted that

the president and secretary of the Fibrecraft Chair Company, who were likewise the owners of all but three shares of its capital stock, had ample authority to bind that corporation in any transaction within the scope of its powers. In C. L. & L. Motor Express Co. v. Achenbach, 259 Ky. 228, 82 S. W. (2d) 335, 339, we said: "The court has consistently recognized that each corporation is a distinct entity, but in harmony with the more recent views of the courts generally we have not hesitated to look beyond the form or shadow when the corporation is the mere dummy or alter ego or conduit of individuals or of another corporation, and it is necessary to disregard legal fiction in order to circumvent fraud or to remove a mere shield against responsibility. Louisville & Nashville Railroad Co. v. Carter, 226 Ky. 561, 10 S. W. (2d) 1064; Lowry Watkins Mortgage Co. v. Turley-Bullington Mortgage Co., 248 Ky. 285, 58 S. W. (2d) 591."

The provisions of section 883b-3 are intended for the protection of stockholders. There could be no other reason for requiring their written consent. It is not claimed that this contract is a fraud on the Fibrecraft Chair Company, and when we examine its organization the proof demonstrates that the entire beneficial ownership of the corporation was represented in this transaction. The only persons who could be hurt by ignoring the corporate fiction of the Fibrecraft Chair Company are the individuals who signed the contract. It is difficult to conclude, therefore, that the defense here asserted is anything more than an attempt to avoid a contractual responsibility through the interposition of a mere legal fiction, and that the case falls within that line of decisions holding that under such circumstances the fiction will be ignored. It is undoubtedly true that they did not purport to act for the Fibrecraft Chair Company, but they acted for themselves, and they *were* the Fibrecraft Chair Company. They owned its stock, and were the active directors of its affairs. In fact, if not in name, Messrs. Brown and Irion were "holders of the capital stock" of the Hermitage Land & Timber Company within the meaning of the statute. In other words, under the facts here admitted, the consent of Messrs. Brown and Irion, evidenced by their signatures to the contract, was, to all intents and purposes, the consent of their alter ego, the Fibrecraft Chair Company.

It is claimed that the contract is too indefinite to permit of enforcement because there is nowhere in it any agreement concerning the price at which the property may be sold. On the contrary, the contract on its face fixes an "asking price" of $100,000. But, aside from this, this contract was not a contract of sale such as was involved in Rehm-Zeiher Co. v. F. G. Walker Co., 156 Ky. 6, 160 S. W. 777, 49 L. R. A. (N. S.) 694, relied on by appellant, but it was simply a contract employing an agent to sell and fixing $100,000 as the minimum price he must ask without further discussion with his principal. There would have been no necessity for inserting even the agreed "asking price" unless it was intended to grant plenary authority to the agent to close a trade at that price. The contract would still be sufficiently definite even if it simply authorized the agent to go out and ask for bids on the property.

It is next insisted that appellant had the right to withdraw Mr. Scott's authority at any time and that the contract is therefore lacking in mutuality. The trouble with this argument is that the contract was not terminable at the will of the appellant, but was to continue for 90 days. Conceding that the authority of Mr. Scott to sell at a price of $100,000 was terminated by the unforeseen boom in distillery properties (Restatement of the Law of Agency, sec. 109), his right to act on behalf of his principal was not thereby annulled any more than it was by the letter written to him by the Hermitage Land & Timber Company withdrawing his authority to sell at any price "until the matter has been further discussed between us." The evidence indicates that after receiving the letter from the Hermitage Land & Timber Company, Mr. Scott did not again seek to act under his contract until he was approached by the Allied Brewing & Distilling Company *at the suggestion of Mr. Irion* and he went *with Mr. Irion* to Louisville for the purpose of opening up these negotiations. No one questions Mr. Scott's good faith in all of these dealings, and we think that he was clearly entitled to rely on the invitation of Mr. Irion (an equal owner with Mr. Brown) to resume his activities on behalf of the Hermitage Land & Timber Company.

It is next insisted that there is no evidence that the brewing company was the real purchaser or that

Mr. Scott procured it as a purchaser. Aside from the very potent fact that the brewing company admittedly got the property, there was testimony to the effect that the only reason for not making a deed direct to the Allied Brewing & Distilling Company was to avoid the payment of a commission on the sale, and that the intermediary, Hoffman, had no funds with which to purchase the property. There was also evidence indicating that negotiations with Hoffman did not commence until some months after the transactions here involved, and from this it might be deduced by the jury that the contract with him was antedated. It is further shown that Mr. Scott was approached by the Allied because of the existence of the contract here sued on, and that he actually negotiated the sale with the full knowledge and consent of Mr. Irion. There was therefore ample evidence to take the case to the jury on this question.

It is urged that the trial court erred in its instructions to the jury and in refusing eight instructions offered by the defendant. It is argued by appellant that the contract of agency with Mr. Scott was revoked and that his remedy under the circumstances is limited to the recovery of damages for the breach of contract. We do not so interpret the contract. On the contrary, as pointed out above, we do not consider that Mr. Scott's authority was revoked other than temporarily and until the matter could be further discussed. The further discussion occurred with Mr. Irion, possibly even with Mr. Brown.

In the view that we have taken of the case, and in the view evidently taken by the trial court, the instructions fairly presented the issues and were even more favorable to the appellant than it was entitled to demand.

Finally, it is insisted that the closing argument of counsel for Mr. Scott and the permission of the court to the jury to take the contract sued on into the jury room constituted reversible error. Counsel argued that the contract gave Mr. Scott power to sell the property at not less than $100,000. The contract is reasonably open to this interpretation. What other purpose could there be for inserting therein an agreement to furnish a deed of general warranty? Counsel likewise argued that the contract gave Mr. Scott the

exclusive right to sell. Upon objection to this argument, the court admonished the jury that the defendant itself likewise had power to sell the property.

We do not consider that these statements were prejudicial, nor even that they were erroneous. The jury had heard the contract read and had listened for several days to testimony involving its provisions. It was within the discretion of the trial court to permit the jury to take the contract into the jury room, if it desired to do so. A. Arnold & Son Transfer & Storage Co. v. Weisiger, 224 Ky. 659, 6 S. W. (2d) 1084. We are not prepared to interfere with that discretion under the facts presented here.

Judgment affirmed.