EMMA V. MARTINEK, Administratrix, v. SWIFT & COMPANY, Appellant.

122  611
p124  506.

122  611
d140  612

Negligence: DEATH FROM ELECTRIC WIRES: EVIDENCE. In an action
1    against a consumer of electricity for the death of plaintiff's
decedent caused by an electric current while handling a light
on defendant's premises, the evidence is considered and held
insufficient to show negligence on the part of defendant as
charged, namely: that the light wire was improperly stapled;
that it was hung over iron hooks; that the defendant per-
mitted the insulation to be burned or worn off, and that it
failed to provide appliances to prevent the passage over the
wire of dangerous voltage caused by lightning.

Negligence: EVIDENCE. Where the testimony of one not an ex-
2    pert electrician that the current which killed decedent would
not have caused his death had defendant used a porcelain in-
stead of a brass socket is contradicted by all the experts testi-
fying for both parties, and it otherwise appears that it was
not negligent to use a brass socket, the evidence is insufficient
to support a verdict.

Evidence. Evidence that an iron was hanging over the electric
3    wire which caused the death of decedent in such manner as
likely to produce a greater current, was improperly admitted,
in the absence of a showing that defendant was responsible
for the presence of the iron.

Negligence: CONSUMER OF ELECTRICITY. A consumer of electric-
4    ity having no control over the company's plant is not liable
for an injury resulting from a defective converter.

*Appeal from Linn District Court.*—HON. WM. G. THOMP-
SON, Judge.

FRIDAY, FEBRUARY 5, 1904.

ON the 10th day of June, 1901, a refrigerator car loaded
with dressed beef, the property of the defendant, was stand-
ing on a side track in the city of Cedar Rapids near the de-
fendant's local office. The meat was for sale to the trade gen-

erally, and for the purpose of providing sufficient light for its inspection by customers an electric light wire or cord was run from the office into the car through its door, to the car end of which was attached an ordinary brass socket and a lamp protected by wire netting. The cord was so arranged that the light could be carried about in the car. On the morning in question the plaintiff's intestate went to the car for the purpose of buying meat, and, while inspecting the same with the electric light in his hand, a current of electricity passed through his body, causing instant death. This suit was brought by the plaintiff to recover damages therefor, originally against the defendant and the Cedar Rapids Electric Light & Power Company jointly, but afterwards and before the trial the light and power company was eliminated from the case. The petition as amended is somewhat obscure, but an analysis thereof shows clearly that the only charges of negligence made against the present defendant were: First, that the wire passing from the defendant's office to the car was stapled to the supporting post with iron staples; second, that the wire was hung over iron hooks in the car; third, that the defendant permitted the insulation on the wire to be burned or worn off where it entered the car; and, lastly, that this defendant was negligent in not providing proper appliances to prevent the passage over the wires of an increased and dangerous voltage caused by lightning. There was a trial to a jury, and a verdict and judgment for the plaintiff. The defendant appeals.—*Reversed.*

*Grimm, Trewin & Moffit* and *Barry Gilbert* for appellant.

*Jamison & Smyth* for appellee.

Sherwin, J.—The dominant question in this case is whether the plaintiff has proven such negligence on the part of the defendant as will entitle her to recover for the death of her intestate. The question is an important one, and one of unusual interest, and it has been ably and exhaustively argued from every

1. NEGLIGENCE: death from electric wire: evidence.

point of view. The proper limits of this opinion, however, forbid an extended discussion of the exact scientific principles governing electricity and its use and control, and in disposing of this branch of the case we shall only mention some of the controlling facts, and announce our conclusions therefrom. The Cedar Rapids Electric Light & Power Company owned and operated a light plant where its dynamos were located, and where the electricity was generated which lighted the defendant's office and car. The electricity was conducted to the defendant's place of business in the following manner: Connecting with the dynamos at the power house were two wires called by electricians "primary wires." These primary wires were strung as such wires usually are, and extended about a mile from the power house, where they were connected with the primary coil of insulated wire in a converter or transformer, which was fastened to a pole thirty feet above the ground. These primary wires were charged with one thousand volts of electricity, and when they and the primary coil within the converter were in perfect condition a current of electricity of one thousand volts was constantly passing through them, from the dynamo to the coil through one wire, and from the coil back to the dynamo through the other or opposite wire, thus establishing a complete circuit. Within the converter there was also another coil of insulated wire called the "secondary coil." When in place this coil is entirely independent of and disconnected from the other or primary coil. From this secondary coil two wires extended to the defendant's car, one to conduct the current of electricity there, and the other to conduct it back to the coil. The two wires in the car were connected with a socket and lamp, and when the latter was burning there was a complete circuit from the coil to the lamp, and from the lamp back to the coil again. This circuit is known as the "secondary circuit" and the wires as "secondary wires." The purpose of the converter is to supply, by means of a current of small quantity and high potential in the primary circuit, a current of large quantity and low potential in the secondary circuit, so that

when the current reaches the consumer it is only such as may be used without danger to life. In the instant case the current furnished the secondary circuit was one hundred or one hundred and six volts, and this was supplied by induction. From this imperfect description of the two circuits it will at once be seen that if the converter in a given case is in proper order and is doing its work as it should be done, no greater voltage can reach the secondary circuit from the primary than the secondary is intended to receive.

After the death of Martinek, the light and power company examined and tested the primary and secondary circuits, and found the converter in such condition that the one thousand volts of the primary wires had passed to the secondary wires of the circuit, and it is therefore beyond dispute that this powerful current passed through the body of Martinek. There was no danger to life in the current of one hundred volts which the secondary wires carried to the consumer, but this is not of great importance here, for, as we have seen, Martinek received and was killed by the current from the primary wires passing through the defective or broken-down converter to the secondary wires.

Upon the trial the plaintiff, over the defendant's objections, attempted to prove acts of negligence on the part of the defendant not pleaded. These matters we shall consider later, and now consider those which were pleaded. There is no evidence tending to support the charges of negligence in stapling the wire on the outside of the car, or in passing it over the iron hooks on the inside thereof. The evidence shows, however, that the insulation was worn off of the wire where it passed through the car door, and that it was there stapled to the frame of the car, but it is not claimed that the deceased was in contact with the wire at this point. The evidence tends to prove, however, that the wires may have been partially grounded by reason of this open contact with the car, but, if that were true, it is unquestionably true also that such grounding of the wires would afford a path to the ground for any current of electricity passing through them,

for all the witnesses agree that electricity always seeks the ground by the shortest route possible. It follows, then, that the absence of insulation at the point in question and the stapling of the wire to the car could by no possibility have contributed to the death of Martinek.

The negligence alleged is not providing proper appliances for arresting lightning is entirely without proof in its support. There had been an electrical storm that morning an 2. NEGLIGENCE: hour or so before Martinek was killed, but at evidence. the time of his death there was no storm; it had long since passed away, and the morning was then bright and clear. Furthermore, there is no evidence tending to show that the lightning struck this circuit.

Though not alleged as grounds of negligence, the plaintiff was permitted to offer evidence to the effect that it was dangerous to use a brass socket at the end of the wires, and dangerous to use a wire screen over the lamp. This testimony was improperly admitted under the issues, as we have already seen, but, notwithstanding this, we will consider it as properly in the case for the purpose of making final disposition thereof. The superintendent of the light and power company testified for the plaintiff that it was dangerous to use a brass socket without insulation, and that if a porcelain socket had beeen used in place thereof one thousand volts of electricity would not have produced death. This testimony is entirely unsupported by the testimony of other witnesses, and is in fact contradicted by all of the experts who testified touching the matter, including those used by the plaintiff. It is said, however, that because he so testified the question was for the jury, and that its finding should not be disturbed. It is not true, however, that because there is testimony on a given ponit it must go unchallenged. This witness stated that he did not pretend to be an expert electrician, and his entire testimony on the subject of electricity conclusively demonstrates that he is not an expert, and that he in no measure underestimated his knowledge of the subject. In addition to this, it is undisputed that there were four or five other

consumers on this same secondary circuit, and that an employe of one of them received a current of electricity through a porcelain socket which he just touched with his fingers, which knocked him down and rendered his unconscious. This occurred about thirty minutes before Martinek was killed, and it is probable that this other man would have been killed also had he held the socket in his hand. He fell, however, and broke the connection, which probably saved his life.

But aside from this it was not negligence for the defendant to use a brass socket. They were then in universal use on secondary circuits, not only in Cedar Rapids, but everywhere, and were then and are now considered absolutely safe so far as danger to life is concerned. The fact that they will not resist a current of one thousand volts is not proof of negligence, for the defendant only contracted for a safe commercial current of electricity, and was bound only to supply proper appliances for its safe use. We are constrained to hold that the evidence on this branch of the case is wholly insufficient to support the verdict.

Testimony was also erroneously received that a horseshoe hung over the wires leading out of the defendant's office on the morning in question, and that its position, if it was in contact with the building, would have a tendency to ground the wire and to break down the converter, and to induce the one thousand voltage to the secondary circuit; but, even if this most improbable effect could have been produced by the position of the shoe, it is not shown that the defendant put the shoe there, or when it was in fact placed there, or that the defendant knew that it was there until after the death of Martinek. Moreover, no direct evidence shows that it was in contact with the building. The only thing supporting such theory is an inference from the fact that it was hot when taken down. To predicate negligence on the position of this shoe it was necessary to prove that the defendant was in some way responsible for its being there at the time of the accident, and there is absolutely no proof of such fact.

3. EVIDENCE.

Unless the defendant in some way caused the defect in the converter it cannot be charged with liability for its defective condition.  It was a consumer only, having no control

4.  NEGLIGENCE: or authority over any part of the  light and
    consumer of
    electricity.   power company's plant, wires, or converters.
The secondary circuit was brought by the company to the defendant's office, and it had no control over any part of the system except the wires within its office and car.

The plaintiff seems to have thrown out a dragnet hoping to prove some act of negligence on the part of the defendant which would bring her a verdict.  She succeeded in getting the verdict, but a very careful examination of the record convinces us that no negligence on the part of the defendant was proven, and that the verdict is wrong.

But little need be said regarding the other errors argued. The testimony of the witness Fawcett was incompetent because he was admittedly not an expert.  It was also error to admit testimony foreign to the issues presented by the pleadings, and much such testimony was received.

The eighth instruction was the law of the case, whether right or wrong, and should have been followed by the jury, and a verdict returned thereunder for the defendant.

Instruction 10 asked by the defendant should have been given.  It told the jury that if a verdict was found against the defendant it could not recover the amount from the light and power company.

The jury should have been instructed to find for the defendant on the whole case.  It is unnecessary to mention other errors.  For those pointed out, the judgment is REVERSED.