W. C. REIMER, Administrator, Appellee, v. WALTER P. MUSEL, Appellant.

No. 42153.

378

M. W. Hyland, and Putnam, Putnam, Langdon & Fillmore, for appellant.

Jensen & Wieben, for appellee.

MITCHELL, J.—The accident happened about midnight on July 31, 1932, on the Lincoln Highway, which is known as Highway No. 30. Just east of the scene of the accident the Lincoln Highway runs east and west. There is a pavement connecting with the Lincoln Highway at this point which runs directly west, in line with the east and west portion of the Lincoln Highway, to the town of Chelsea, which is about three-fourths of a mile west of the scene of the accident. The Lincoln Highway at this point curves gradually to the north, forming a Y with the paved road which continues straight on into Chelsea. After curving to the north, the Lincoln Highway runs in approximately a northwesterly direction. It is a paved highway and 18 feet wide. The curve to the north which the highway makes at the Y is a five and a half degree curve. On the north side of the pavement, just after the Lincoln Highway starts to curve to the north, was a concrete flume or waterway, extending from the north edge of the pavement out across the shoulder of the road. Near this flume and at the extreme north edge of the shoulder was a guard post.

On the evening of the accident, about twenty minutes of twelve, Clarence Reimer, the appellee's decedent, had left Belle Plaine, a town to the east, in his 1930 Chevrolet coach. There was no one in the car with him. Prior to the collision, the appellant was driving his Model A Ford Tudor in a southeasterly direction around this curve. He was also alone. Clarence Reimer was driving in a general west or northwesterly direction on the Lincoln Highway.

The appellant was the only eyewitness to the accident. He testified that he was on the right-hand side or the southwest side of

the black line at the time of the collision and was traveling about 35 miles an hour. There was no other evidence as to how the accident happened, except as shown by the physical facts. Clarence Reimer was killed in the accident. The appellee was appointed administrator of his estate and commenced this action to recover damages due to the negligence of the appellant.

· It is the claim of the appellee that the physical facts in this case show that the appellant, immediately preceding and at the time of the collision between the two cars, was driving on the left-hand ·side of the center of the traveled portion of the highway, and upon meeting the car driven by Reimer, the appellant failed to give one-half of the traveled way thereof by turning to the right. This was the sole and only ground of negligence which the court submitted to the jury. It is the appellee's claim that the physical facts in this case squarely contradict the testimony of the appellant. The physical facts relied upon by the appellee are: First, the location of the two cars after the collision; second, broken glass scattered over the pavement, mainly on the north side and near the north shoulder; third, the condition of the cars, showing how they came together, after the accident; fourth, a certain diagonal black mark was found on the north curb, appearing to be made as by burning or sliding of the tire, with the brake set. This diagonal mark extended into the shoulder, leading up to the flume, beyond which lay the Reimer car.

At the end of the testimony, both sides having rested, the appellant made a motion for directed verdict, setting up among other grounds for sustaining the motion that the appellee had failed to prove by a preponderance of the evidence any negligence on the part of the appellant, and that any negligence on the part of the appellant, if there was any, was the proximate cause of the alleged accident and the appellee's decedent's resultant death. Other grounds were alleged in the motion for directed verdict, but it will not be necessary for us to consider same. The court overruled the motion for directed verdict, and submitted the case to the jury. A verdict was returned by the jury in favor of the appellee, and, from the ruling on the motion to direct the verdict and from the ruling on the motion for a new trial, the appellant has appealed.

The appellee's right to recover in this case is based entirely upon circumstantial evidence. Negligence may be based on circumstantial evidence, if the same reasonably supports the conclusion

to be drawn therefrom. This court in a recent decision in the case of Stickling v. Chicago, R. I. & P Railroad Co., 212 Iowa 149, 153, 232 N. W. 677, 679, said:

"The rule, well settled in this state, is that 'a theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such a nature, and are so related to each other, that it is the only conclusion that can fairly or reasonably be drawn from them.' "

Again, in the case of In re Hill's Estate, 202 Iowa 1038, at page 1039, 208 N. W. 334, 335, this court said:

"Plaintiff relies wholly on the circumstances and physical facts as revealed after the accident. Plaintiff's case is based on presumption and inferences, and the propositions present several pathways leading to fields of speculation and conjecture. As in all cases of this character there are two primary questions: (1) Has the plaintiff sustained the burden of proof as to the negligence charged against the defendant? (2) Has the plaintiff sustained the burden of proof as to freedom from contributory negligence? The onus in these two particulars rested on the plaintiff throughout the entire case. If plaintiff failed in either one of these particulars, the trial court properly sustained the defendant's motion for a directed verdict."

And at page 1043 of 202 Iowa, 208 N. W. 334, 336:

"Negligence cannot be predicated on presumption or inference, and the proffered evidence in this case would raise collateral and remote issues and, as said in Adams v. Chicago, M. & St. P. R. Co., 93 Iowa 565, 61 N. W. 1059, 'would lead to all manner of complications.' See, also, Gray v. Chicago, R. I. & P. R. Co., 143 Iowa 268, 121 N. W. 1097."

In the case of Schmidt v. Hayden, 205 Iowa 1369, at pages 1371, 1372, 219 N. W. 399, 400, this court said:

"Where it is sought to establish by circumstantial evidence that the alleged negligence is the proximate cause of the injury, such evidence must exclude every other reasonable hypothesis. Asbach v. C., B. & Q. Ry. Co., 74 Iowa 248, 37 N. W. 182; Neal v. C., R. I. & P. Ry. Co., 129 Iowa 5, 105 N. W. 197, 2 L. R. A. (N. S.) 905; Tibbitts v. Mason City & Ft. Dodge Ry. Co., 138 Iowa 178, 115

N. W. 1021; Kearney v. Town of De Witt, 199 Iowa 530, 202 N. W. 253. We have also said that, where the evidence is in equipoise, the plaintiff must fail. George v. Iowa & S. W. Ry. Co., 183 Iowa 994, 168 N. W. 322.

"Another rule of this court is that the cause of the accident must be clearly shown and cannot be left to speculation or conjecture. Pearson v. Wilcox, 109 Iowa 123, 80 N. W. 228; Martinek v..Swift & Co., 122 Iowa 611, 98 N. W. 477; Anderson v. Wapello Coal Co., 151 Iowa 479, 131 N. W. 684."

Thus there appears to be no question about the general rule of law. What concerns us is its application, and to apply it to the case at bar we must carefully consider the record before us.

The appellee's first claim is the location of the two cars after the collision. There seems to be little dispute in the record in regard to the location of the cars after the accident. The Musel car was in the center of the paved portion of the highway, headed north, about 4 feet east of the flume. The Reimer car was north of the north edge of the pavement, headed south, about 6 or 8 feet west of the concrete flume. The undisputed evidence shows that the concrete flume was approximately 10 feet wide. So at the time these two cars came to rest after the collision, the Musel car, being about 4 feet east of the flume, and the Reimer car 6 to 8 feet west of the flume, they were at that time better than 20 feet apart. And no negligence on the part of the appellant is shown by the location of the cars. Where they were when they came to rest proves nothing whatever with reference to their location at the time of the collision.

The next physical fact which the appellee relies upon is the broken glass on the pavement after the accident. There is testimony in the record that there was broken glass on the pavement and a great deal of it on the north side and north shoulder of the pavement. Of course, when these two cars collided, the glass was broken in both cars and scattered over the pavement. The glass in the Reimer car was broken, and it may have been that, when the Reimer car crossed the flume, as it no doubt did, glass dropped out of the Reimer car onto the north side of the pavement and the north shoulder. There is nothing in the record, from the location of the glass, that proves the location of the cars at the time of the collision.

The next physical fact relied upon by the appellee is the con-

dition of the cars after the accident. The record is not very clear in regard to this. But, there were offered two photographs, taken of the cars some little time after the accident. The record and the photographs show that the left front corner of the Musel car was struck, and also that the left front side of the Reimer car was struck. From the record before us, and from the photographs offered in evidence, we cannot say that the damage to the cars proves anything. Both cars were badly wrecked. There is nothing about the condition of the cars after the accident to indicate anything with regard to the location of the cars at the time of the collision.

Finally we come to the main physical fact upon which the appellee relies. The appellee was permitted to offer testimony relative to a black mark on the pavement, which, according to the witnesses the appellee offered, began about twenty feet east of the flume, showed on the pavement approximately three or four inches, with its general direction off the pavement onto the shoulder, towards the flume. The witness who was most favorable to the appellee's contention was George Cavalier, who testified as follows:

"I was not at the scene of the accident until 7:00 o'clock the next morning. The cars were not there at the time. I didn't see the accident happen. I didn't see either of the cars make any mark.

"I am acquainted with Highway No. 30. It is the Lincoln Highway. There is a great deal of travel over it at all times. I imagine there was a great deal of traffic and travel there at the scene of the accident. That is that passed it.

"Q. And things had been torn up considerably around this particular place and the wrecker had been there? A. Whatever they used to pull the car out with. I don't know what they used to pull it out with but after the broken piece of the car was pulled over the shoulder you could see the marks of that car.

"There were parts of those wrecked cars scattered around there. The pavement itself was open so you could travel and travel had been going over the pavement at all times after the accident. I drove up there in a car myself. Both cars had been removed and both boys had been removed. When I drove up there we parked our car on the right side of the highway coming from Chelsea. We came out of Chelsea on the old highway. It had rained when we came down there. It had been raining before we got there. We drove down in the rain.

"I had sold Clarence Reimer the car which was in the wreck. The mark I have described was a black mark from the tire riding on the pavement starting about twenty feet east of the flume and it is on the pavement approximately three or four inches and its general direction is off the pavement onto the shoulder toward the flume. There was just one mark there. There was evidence that the driver of that car put on his brakes and that one wheel slid along the pavement and onto the shoulder and that was torn up. That was the right hind wheel. That had to be the right hind wheel otherwise the wheel would hit the post at the end of the flume.

"The Court: You say you followed this black line up to the flume?

"By the Witness: Yes, sir.

"The Court: Did it end there?

"The Witness: Yes, sir. There was no further mark because the flume was lower than the rest of the shoulder.

"The Court: Was there any mark beyond that of any wheels?

"The Witness: No, sir. That is where the marks in the dirt seemed to be, the wheel marks seemed to end there."

Several other witnesses testified in regard to the mark, but not a single witness saw the black mark on the pavement before 7 o'clock the following morning. It must be kept in mind that the accident happened somewhere around midnight. The record shows that it was dark that night, and no one saw the mark until the following morning. In other words, a period of some seven hours elapsed between the time of the accident and the time the witnesses saw the mark upon the pavement. The record also shows that the highway upon which this accident occurred, to wit, the Lincoln Highway, is a heavily traveled highway, and that between the time of the accident and the following morning when the witnesses first saw the black mark, a great number of cars had driven over this same highway, and one car, driven by the witness Chekal, drove in between the Musel car and the Reimer car shortly after the accident. He applied the brakes, his car skidded, and then went over the concrete flume, breaking one of his tires. The evidence of the witness Chekal is as follows:

"I approached the scene of the accident coming from the east going west. As I remember it it was close to midnight. I was driving about forty-five miles per hour. As I approached that curve I

noticed there was a Ford coach in the center of the pavement just as I started to make the turn. There is a house located to the north of the pavement, a little bush in front, and there was a person waving at that place. I didn't stop. When I got up to the curve was when I saw the Ford in the center of the pavement. I then turned, applied my brakes and turned to the right to avoid hitting it. After I turned, I turned and went off the pavement on the north side and then I was opposite the Chevrolet coach and I turned back to the left to avoid hitting the Chevrolet coach.

"I know that I applied my brakes so as to skid my wheels as I went through there. The front tire on my car was blown out when I hit that water drain. My back tire was blown out also. I recognize Exhibit 'B' as being a plat of this curve. The Ford car was just east of the flume on the pavement. The Chevrolet car was at a point just a few feet west of the flume and north of the pavement. As my car went through there I turned and missed the Ford and hit that flume and there I seen the Chevrolet and turned back left to avoid hitting that. I started to turn to the right at about twenty feet east of the Ford car, missed the Ford, and turned to the right onto the shoulder and left the shoulder just before I got to the flume. My car then went across the flume and turned to the left. My left front wheel was locked during that time. I stopped my car up the road a ways and went back to the scene of the accident."

It thus appears from the record that other cars went through there. It even appears that wheels on cars were locked as they went through there. The Chekal car may have made the mark, or some other car passing by may have made the mark. There is no evidence in the record that the mark was not there before the accident, nor is there any evidence in the record as to whether the mark was made between the time of the accident and the time the witnesses arrived, a period of some seven hours. There is no evidence in the record that either Musel's car or Reimer's car made this black mark, but it is the contention of the appellee the fact that the mark led up to the flume and pointed toward the Reimer car was proof that the Reimer car made the mark. The mark ended at the east side of the concrete flume or waterway. This concrete flume or waterway, according to the testimony introduced, was approximately ten feet wide. The Reimer car was six or eight feet west of the concrete flume. In other words, it was, at the time that the car came

to rest, some sixteen or eighteen feet from the end of this black mark to the Reimer car. Both cars had been removed at the time that this mark was first observed. In view of the fact that this is a heavily traveled highway, that both cars had been removed, and the record shows beyond any question of a doubt that many other cars had driven up and pulled out on the shoulder, that more than seven hours had elapsed before this mark was observed, that there was a distance of sixteen feet between the end of the mark and where the Reimer car stopped, we cannot see where the mark proved the location of the cars at the time of the collision. This is the entire record upon which the appellee bases his right to recover. At the end of the testimony the appellant made a motion to direct a verdict on the ground, among others, that there was no proof of any negligence upon the part of the appellant and no proof of any negligence, if any, which was the proximate cause of the accident. There must have been doubt in the mind of the trial court as to whether or not this motion should be sustained at that time, for in ruling upon same, the learned trial court said:

"Motion for a directed verdict is overruled. That does not mean that I will not consider carefully a motion to set aside the verdict but I want to see what the jury will do first. Defendant excepts."

The burden of proof was upon the appellee to prove by a preponderance of the evidence the negligence of the appellant. We have time and again stated that verdicts should not be based upon mere theory or supposition. Negligence cannot be predicated on presumption or inference. It was the duty of the appellee to prove the cause of this accident; to prove that the accident was due to the negligence of the appellant. This the appellee has failed to do. The lower court should have sustained the motion for a directed verdict and its failure to so do was error. This case must be, and it is hereby reversed.

ALBERT, C. J., and EVANS, KINDIG, STEVENS, ANDERSON, CLAUSSEN, and DONEGAN, JJ., concur.