## C. L. & L. Motor Express Co., Inc., et al. v. Achenbach (two cases).

(Decided Feb. 12, 1935.)

GORDON, LAURENT & OGDEN and STOLL, MUIR, TOWN-
SEND & PARK for appellants.

RICHARDSON & RICHARDSON and HAROLD R. MARQUETTE
for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

Upon the joint trial of suits for damages growing
out of an automobile accident, filed by the appellees,
Henry Achenbach and his daughter, Miss Elizabeth
Achenbach, against the appellants C. L. & L. Motor
Express Company, and Union Transfer & Storage Com-
pany, judgments for $2,674 and $13,650, respectively,
were recovered. Both parties were seriously injured.
The principal grounds for reversal of the judgments
relate to two distinct statements of fact. In respect
of the matter of negligence, it is contended by both
appellants, who were charged to be jointly responsible,
that the verdict is flagrantly against the evidence. The
Union Transfer & Storage Company (to be referred to
as the Union Company) maintains that there was not a
scintilla of evidence tending to prove liability upon its
part for the act of the driver of the truck, found by the
jury to be negligent. Arguments that incompetent evi-
dence was admitted and a proper instruction refused
are also presented.

The accident occurred in the afternoon of July 30,
1932, in St. Matthews, a suburb of Louisville, on United
States highway No. 60. The road runs east and west,
has a 25-foot paved surface with 4 or 5 feet of macadam
on each side. It is level and unobstructed beyond that

about the same width on each side, so it may be regarded as a roadway 45 feet wide. Along the north side are store buildings and a filling station. On the south side a street called the Lexington road diverges at a sharp angle.

The two plaintiffs agree in their testimony, which may be thus summarized: With Mrs. Henry Achenbach, the wife and mother, the plaintiffs were driving westwardly into Louisville. After having stopped at a traffic light, Mr. Achenbach drove slowly behind the Plymouth car of Richard W. Myers, which stopped on the right hand or north side, at the intersection of the Lexington road, without a signal, but about halfway on the paving and halfway on the berm of the road. Plaintiffs' car, going 10 to 15 miles an hour, was then about 30 feet behind it. Achenbach turned slightly to his left to pass this standing automobile, and both plaintiffs saw a truck approaching from the west about 300 feet away. It was passing an automobile coming in the same direction. This put the truck on the north or its left side of the road. As it got closer, the plaintiffs' car was immediately stopped 12 or 14 feet behind the Myers car at a slight angle, the front being cut a little to the left, but still entirely on the right of the center of the road. The truck came on, running 30 or 35 miles an hour on the wrong side of the road, and struck the plaintiffs' car six seconds after it had come to a stop. Achenbach testified that he had stopped to give the truck an opportunity to pass on its proper side of the road, and that he did not have time to back out of the way. About the only difference between the evidence of Miss Achenbach and that of her father is that she testified that their car was stopped ''in back'' of Myers' machine. All agree that the automobile was knocked or shoved over to the extreme south side of the road. This was to the right of the truck and the left of the automobile.

The plaintiffs introduced the driver of the truck for the purpose of showing his connection with the defendants. His cross-examination and the evidence of other witnesses called by plaintiffs, as we construe their testimony, contradicted plaintiffs and sustained the claims of the defendants as to how the accident occurred. The driver of the truck testified that he did not remember passing any car going in the same direction;

was traveling about 20 miles per hour on the right side of the road, and slowed down as he approached the street intersection, and went into third gear. Several automobiles were in line meeting him. A machine had run along practically parallel with him over to his right on the Lexington road, and it stopped about 10 feet from highway No. 60. The Myers car stopped well up toward the middle of the road and not half over on the berm. When he was about the center of that car and in the act of passing it, the Achenbach car came from behind it. He put on his brakes and turned to the right, but the automobile's right front wheel struck the truck at an angle just inside its left front wheel. After the collision the truck was over near the south side of the road with a part of the automobile under the bumper.

Myers' testimony is that he saw the truck approaching and stopped to let it get by before turning to the left to enter the Lexington road. He was about two feet from the center of the highway, and no part of his machine was upon the macadam or berm. The truck did not pass any car and came on upon its right side of the road but close enough to the center that he could have touched it by reaching out his arm. Before stopping he had held out his hand as a signal that he was going to do so, and heard the screech of brakes right behind him. The truck was then 4 or 5 feet in front of his car, and the collision occurred about 10 feet behind him.

Lloyd Alford was in the car over on the Lexington road. He stopped to let the truck go by. It was traveling on the right side of the road up close to the center, but not straddle it. It did not pass any other car going in the same direction, and slowed down at the place. The Myers automobile had stopped partly on and partly off the pavement, but just a few feet from the center. He saw the Achenbach car crossing the road and it was moving when the collision occurred near the center of the highway. A county policeman, who quickly arrived on the scene, testified that there were skid marks 3 or 4 feet north of the center of the road for about 20 feet, and these turned southwesterly to where it appeared that the wheel or tire had been knocked off; then the marks on the road were as if the car had

been knocked or dragged 25 or 30 feet southeasterly over to the south side where the wreck was. A garage man, to whom the plaintiffs' car was taken, testified that the bumper of the truck had hit its right front wheel and mashed in the right door. A picture filed in the record indicates clearly that that is where the machine was struck.

We turn to the defendants' evidence. They introduced four bystanders who apparently were entirely disinterested. Their testimony is all alike and to the effect that the Myers automobile stopped a foot or two feet from the center of the highway and not upon the berm. The screeching or grinding of brakes upon the Achenbach car had attracted their attention. They say that although it was moving slowly it cut to its left and darted out from behind the Myers car when the truck was 10, 12, or 15 feet away, and it was about 2 feet south of the center of the paving when it was struck. This clearly proves that it was on the wrong side, but the right side for the truck. A mechanic testified that the truck was hit or damaged on the left front; and another that it had a governor which limited its speed to 30 miles per hour.

Section 340, Civil Code of Practice, authorizes the courts to vacate a verdict and grant another trial when it is not sustained by sufficient evidence or is contrary to law. We have a legion of cases construing and applying this statute. The interpretation is usually and comprehensively stated to be that the verdict must be palpably or flagrantly against the weight of the evidence. The difficulty arises in the application. One case differs from another, so the application rests in the sound judicial discretion of the court to whom the problem is submitted. In its consideration neither the preponderance or volume of the testimony nor the greater number of witnesses control. The quality of the entire evidence is weighed or balanced. Louisville & N. Railroad Company v. Baker's Adm'r, 183 Ky. 795, 210 S. W. 674; Iseman v. Hayes, 242 Ky. 302, 46 S. W. (2d) 110, 85 A. L. R. 996; Smith v. Ferguson, 256 Ky. 545, 76 S. W. (2d) 606.

In the case at bar, the evidence of every disinterested witness clearly proves that the truck was traveling at a reasonable speed wholly upon its side of the road;

that the Myers car stopped altogether upon the paving;
that plaintiffs' car came up behind with such pronounc-
ed screeching of the brakes as showed speed and in the
emergency a turning to the left into the path of the
truck. Myers' testimony is that he stopped close to
the center and waited for the truck to pass before turn-
ing to his left into Lexington road. The natural thing
would be to stop near the center rather than off to the
right. Alford on the Lexington road also was waiting
upon the truck before coming on the highway. So both
men had their attention centered upon the situation be-
fore the Achenbach car came on the scene. We are not
unmindful of the evidence of the plaintiffs that, al-
though their car was turned to the left, it was still on
its right side of the center of the road. Let us turn to
the physical facts about which there is no dispute. The
patrolman puts the skid marks of the automobile for a
distance of about 20 feet close to the center, and then
a turn towards the center, but without undertaking to
say just how far they went before the indication of a
breakdown of the tire or wheel. Of greater signifi-
cance is the fact that plaintiffs' automobile was struck
on the right corner, thus demonstrating that the entire
front of the machine was in the path of the truck. Its
right front wheel was struck at a point well within the
left front wheel of the truck. The marks on the road
showed that from the point of collision both cars went
diagonally across to the right side of the truck. The
value of ''physical facts'' or demonstrative evidence has
often been commented upon. Sometimes where there
was a variance they were such as to overcome all ver-
bal testimony and to require that it be disregarded even
though uncontradicted. Louisville & N. Railroad Com-
pany v. Chambers, 165 Ky. 706, 178 S. W. 1041, Ann.
Cas. 1917B, 471; Louisville Water Company v. Lally,
168 Ky. 348, 182 S. W. 186, L. R. A. 1916D, 300; Com-
monwealth Life Insurance Company v. Pendleton, 231
Ky. 591, 21 S. W. (2d) 985, 66 A. L. R. 1526; Globe
Indemnity Company v. Daviess, 243 Ky. 356, 47 S. W.
(2d) 990; Annotations, 8 A. L. R. 798. Of course, the
rule is inapplicable if there is any doubt about the
physical facts. Observation by the parties in a collision
is made in a moment of alarm and peril. It is a thing
which is difficult enough to judge or describe accurately
even if coolly and deliberately observed. So the angle

of collision, the point of contact, and the effect on the vehicles are valuable in determining doubts if not of controlling importance. Freakish effects are sometimes caused by violent impacts of moving bodies, and that may have been so here, but it is extremely improbable, whether tested by experience or by the accepted laws of motion and mechanics. The physical facts combined with the consistent testimony of disinterested and unalarmed witnesses as to the situation and accident have produced the conviction that the verdict is contrary to the evidence. Moore on Facts, secs. 155, 519. In McGuiggan v. Hiller Bros., 209 Wis. 402, 245 N. W. 97, 98, after reciting the facts of tire marks on the road and the injuries to a truck and coupe, the court said:

"These physical facts must be treated as verities, and are open only to the inference that defendant's truck was on its proper side of the highway, and that plaintiff's automobile was not. Under these circumstances, plaintiff's testimony that he was driving on his own side of the highway, and that a portion of defendant's truck was being operated upon the wrong side of the highway does not create a jury question upon this issue."

See, also, Holborn v. Coombs, 209 Wis. 556, 245 N. W. 673; Reimer v. Musel, 217 Iowa, 377, 251 N. W. 863; Kerner v. Peacock Dairies, 129 Cal. App. 686, 19 P. (2d) 283.

We may repeat the applicable conclusions stated in Cumberland Railroad Company v. Girdner, 174 Ky. 761, 192 S. W. 873, 875:

"In addition to the fact that the testimony of the witnesses who saw the accident is almost conclusive that it did not happen as claimed by appellees, but did happen as claimed by appellant, the physical facts in evidence are so contradictory to appellees' witnesses, and corroborative of the testimony for appellant, that we are unable to avoid the conclusion that the verdicts of the jury herein are flagrantly against the evidence."

Inasmuch as there may be another trial, disposition must be made of the contention that the Union Transfer & Storage Company was entitled to a peremptory instruction because of nonliability for the driver of the

truck. The suit was first prosecuted against the C. L. & L. Motor Express, and a verdict was rendered against it. The defendant's motion for a new trial was concurred in by the plaintiffs and the verdict was set aside. Thereafter the Union Company was made a defendant and both companies were charged with joint negligence. Argument is made that there was not sufficient evidence even under our scintilla doctrine to authorize the submission of the matter of liability of the Union Company to the jury; and, furthermore, that this court should depart from that rule and in accordance with the practice of many other jurisdictions hold that the issue should not be submitted when the evidence is not sufficient to sustain a verdict if one should be rendered upon it.

. The evidence by concession is that the truck was owned by the C. L. & L. Express and the driver was employed and paid by it; that the two companies were separate corporations; that prior to February, 1932, they had been active competitors with principal offices or stations in Lexington, and had no connection, corporate or otherwise, with one another; that on that day practically all the stock of the C. L. & L. Company was sold and transferred by H. O. Kemp and wife to William Rodes, who in turn transferred portions of the stock to D. A. Crosby and O. B. Murphy. Four shares of the stock remained the property of O. T. Weathers. At the time of the accident, Rodes, Crosby, and Murphy owned all of the stock in the Union Company, and they and Weathers were the only stockholders of the C. L. & L. Company. Crosby was president of both companies. Weathers was secretary and treasurer of the C. L. & L. Company and had no official connection with the Union Company. He was the manager of the former company at Lexington. The companies occupied the same general offices and used the same depot at Lexington, but the C. L. & L. Company was charged with rental by the Union Company. A bookkeeper and possibly other employees rendered services to both companies, each of which was charged with a proportionate part of their salaries. The C. L. & L. Company owned 20 trucks, which were painted blue, and the Union Company owned 75 trucks, which were painted green. The time of the joint mechanics was apportioned to each company and paid accordingly. They entered separate

depots at Cincinnati. At Louisville the C. L. & L. Company went into the Central Truck Depot, as it had done under the former management. The Union Company went into the Union Depot which was a few squares away. The C. L. & L. Company had an office with its name on the door on the second floor of the Central Depot.

The only evidence tending to show that the operations in and out of Louisville were joint and practically those of one company was given by Mack Carpenter, a subsequently discharged employee. He had been the manager of the C. L. & L. Express when it was owned by Kemp. He testified that afterward he ran the branch office for both companies and was paid by the Union Company; that many trucks used the Central Depot and, while the freight for the Union Company was generally loaded at the other station, its trucks called there every day for freight. The witness was mistaken as to being paid by the Union Company, for all the records and other testimony conclusively show that he was paid by the C. L. & L. Express and that the other company never at any time contributed to his salary. Most of this witness' testimony of any materiality was hearsay, as was also that of Powell and perhaps others having some remote materiality. The overwhelming evidence is that Mack Carpenter was never employed by the Union Company and had nothing to do with its operations, but always looked after the business of the C. L. & L. Express at its station. The manager of the Central Truck Depot testified that the Union Company had never used that station nor had a representative there. It was the depot for 31 different truck lines entering Louisville. Since his station issued its own tariffs and solicited business for its patrons, the C. L. & L. Express was in fact a competitor of the Union Company for it patronized the other station. There must be noted the testimony of W. R. Powell to the effect that the company had separate offices in Louisville and he was the manager of both, and that the Union Company had five different offices, including the Central Depot, and that he took care of the business of the C. L. & L. station under the supervision and direction of the Union Company. There is evidence that after the C. L. & L. Express stock had been sold to the stockholders of the Union Company, its name was removed from many of

its trucks, including that involved in this accident. That is explained by the fact that the former body had been recently replaced by a lighter one.

The truck involved in the accident was owned exclusively by the C. L. & L. Express, and the driver was employed and paid by it. At Lexington that morning gasoline was put in the tank from the pumps of the Union Company, but it was charged to the C. L. & L. Carpenter, the driver, was assisted in loading the truck by Bramlett, an employee of the Union Company. Bramlett drove the truck about a mile in Lexington to the home of Carpenter, who drove his own automobile and left it there. Carpenter then took the truck and drove it the rest of that day. All of the cargo into Louisville was C. L. & L. freight, except a freezer of ice cream, carried for the Union Company. It is not disputed that on the return trip to Lexington that afternoon when the accident occurred, all of the freight was loaded at the Central Truck station and was transported for the C. L. & L. Express only. Bramlett had helped with the loading and was on the truck when the accident occurred, but had nothing to do with driving it. The disabled truck was towed back to Lexington by a truck belonging to the Union Company.

The appellees maintain that the intercorporate relationship, the joint operations, and the particular circumstances of the day, all evidence a concert of action and were such as to sustain the verdict of joint liability. The appellant Union Company maintains there was not a scintilla of evidence establishing a connection or vicarious responsibility on its part for the acts of the driver of the truck.

The court has consistently recognized that each corporation is a distinct entity, but in harmony with the more recent views of the courts generally we have not hesitated to look beyond the form or shadow when the corporation is the mere dummy or alter ego or conduit of individuals or of another corporation, and it is necessary to disregard legal fiction in order to circumvent fraud or to remove a mere shield against responsibility. Louisville & Nashville Railroad Company v. Carter, 226 Ky. 561, 10 S. W. (2d) 1064; Lowry Watkins Mortgage Company v. Turley-Bullington Mortgage Company, 248 Ky. 285, 58 S. W. (2d) 591. The

Carter Case presented a clear sham and unmistakable dummy put forward to avoid the effect of the law. The entire stock of the Frankfort & Cincinnati Railroad Company was owned in fact by the Louisville & Nashville Railroad Company, and it was in fact operating the railroad when plaintiff's injury was sustained. The other case is the converse. The stockholders of one corporation owned practically all the stock in the other, the remainder being held by bona fide stockholders who were in no way concerned in the transaction which gave rise to the litigation. Nor did it appear that the corporation was organized for any ulterior purpose. It was accordingly held that the corporate entity or individuality of the companies could not be ignored. The case at bar is of that class. There was one officer and stockholder of the C. L. & L. Express who had no interest in the Union Company.

In Louisville Railway Company v. Wiggington, 156 Ky. 400, 161 S. W. 209, it was held that it is not sufficient to fix liability for the default or debts of one corporation upon another merely because they are under the same control and have the same general offices. Nor is there a merger of responsibility through disregard of corporate entity where one corporation owns all or part of the stock of another corporation, nor because the stockholders of both companies are identical and they have interrelation dealings. Louisville Gas & Electric Company v. Moore, 215 Ky. 273, 284 S. W. 1082.

In Bergenthal v. State Garage & Trucking Company, 179 Wis. 42, 190 N. W. 901, 904, the stockholders of the Boynton Automobile Livery Company, which was not engaged in the taxicab business, organized a corporation for that purpose, called the Green Cab Company. The corporation had the same stockholders and offices, and the same persons constituted the boards of directors of both companies. They occupied the same offices, and the office employees performed like service for both companies. The accounts of the cab company were kept by the other company. It rendered the bills and charged the cab company for the service. Each corporation paid its rent and hired and paid its drivers. The cabs of the cab company had the name "Boynton" painted on them. They had a common telephone. Bergenthal

and companions called that number for a cab. It came, and after they had become passengers in it there was an accident in which Bergenthal suffered injuries. He recovered a verdict against both companies. In absolving the Boynton Automobile Livery Company of liability, the court wrote:

> "The mere fact that corporations have common officers and occupy common offices does not make the one corporation liable for the action of the other, except upon established legal principles. The mere fact that they have officers in common and places of business in common and to a certain extent transact business for each other does not of itself make them liable each for the acts of the other. In re Watertown Paper Co., 169 F. 252, 94 C. C. A. 528; 14 Corpus Juris 58, par. 19, and cases cited.

> "Such corporations have a right to contract with each other, and their contracts are valid, and can only be assailed on the ground that they are unfair or fraudulent. 14A Corpus Juris 125, par. 9; 4 Fletcher Corporations 3631, par. 2376.

> "There is in this case not the slightest intimation that there was anything unfair or fraudulent in the conduct of the defendant corporations, or that one was used as a cover for the other for any ulterior purpose."

The same may well be said concerning the case before us.

There remains the question of liability arising from the operation of the truck on the day of the accident. We cannot regard as material the fact that Bramlett drove the truck to the home of Carpenter for his personal accommodation. Nor was the day's journey transformed into a joint enterprise by the fact that the owning and operating carrier transported an item of freight for the other company. The conclusion of applicable law in Ashland Coca Cola Bottling Company v. Ellison, 252 Ky. 172, 66 S. W. (2d) 52, does not cover such a situation. In that case there was evidence tending to show that the company's automobile, being driven by its manager was out on its business throughout the journey and although the manager had undertaken, as

a personal enterprise, to transport passengers for hire, he was still on his master's business when the accident occurred.

Much is made by the appellees of the fact that Bramlett, an employee of the Union Company, assisted in loading the truck both in going to and returning from Louisville, and was riding on the machine when the accident occurred. On that account, as it relates to the Union Company, the case cannot be brought within the conclusion of Bowen v. Gradison Construction Company, 236 Ky. 270, 32 S. W. (2d) 1014, or the many cases therein reviewed holding that where one hires a machine and its operator he becomes liable for his negligence. It is, however, brought within the reasoning of that opinion, that is, that the test of liability turns on who controlled the negligent employee when the tort was committed. In this case it was the C. L. & L. Express alone who controlled and had the right to control Carpenter, the driver. It was the master and he was its servant at all times. Bramlett had nothing to do with the operation of the truck, and he is not chargeable with Carpenter's negligence, if any, by the mere fact that he was riding on the truck at the time of the collision. Nothing is related as to his reason for going to Louisville, and we have the evidence only that he helped in the loading. We may assume that he went for the purpose of assisting Carpenter, and that he was simply loaned or hired by the Union Company to the other company for that purpose. Whatever he did was done in the service of C. L. & L. Express and his original master was not liable, even though he remained subject to discharge by it and was paid by it for the day's work. 39 C. J. 1275; Hill v. Poindexter, 171 Ky. 847, 188 S. W. 851, L. R. A. 1917B, 699; Andrews Asphalt Paving Company v. Hall, 227 Ky. 599, 13 S. W. (2d) 755. Nor can we attach any significance to the fact that the wrecked truck was hauled to Lexington by the Union Company.

It seems clear to us that the truck was solely on the business and under the independent control of the C. L. & L. Express and not of a common servant when the accident occurred, and that there was not a scintilla of evidence upon which joint liability could rest.

We do not think the evidence authorized a contribu-

tory negligence instruction on the part of Miss Elizabeth Achenbach, as appellants contend. Argument is also made that incompetent evidence was admitted. There was some which crept in through "fishing expeditions" or other efforts on the part of plaintiffs' counsel to establish more definite facts. Doubtless much of this will not be offered on another trial. At any rate, we reserve the question of error in the matter of the evidence.

It is the conclusion of the court that in respect of negligence both companies were entitled to a new trial because the verdict is flagrantly against the evidence, and in respect of the Union Transfer & Storage Company that there was not enough evidence to take the issue of its liability to the jury.

The judgment is reversed.

Whole court sitting.